UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* THOMAS FISCHER, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 1:14-cv-1215 RLY-DLP |
| | ) ) | |
| COMMUNITY HEALTH NETWORK, INC. | ) ) | |
| Defendant. | ) | |

**<u>UNITED STATES' COMPLAINT IN INTERVENTION</u>**

## **TABLE OF CONTENTS**

NATURE OF ACTION…………………………………………………………………1

JURISDICTION AND VENUE………………………………………………………..2

THE PARTIES…………………………………………………………………………2

LEGAL AND REGULATORY BACKGROUND……………………………………...4

      I. The False Claims Act…………………………………………………………4

      II. The Stark Law …………………………………………………………………5

      III. The Medicare Program ………………………………………………………9

DEFENDANT'S FRAUD SCHEME…………………………………………………14

      I. CHN's Employment of the Breast Surgeons………………………………..17

      II. CHN's Employment of the Cardiovascular Specialists………………………31

      III. CHN's Employment of the Neurosurgeons…………………………………51

      IV. CHN's Payment of Incentive Compensation………...……………………61

      V. CHN's False Claims and Statements………………………………………63

      VI. Scienter……………………………………………………………………66

      VII. Materiality………………………………………………………………69

FIRST CAUSE OF ACTION…..……………………………………………………72

SECOND CAUSE OF ACTION ……………………………………………………..73

THIRD CAUSE OF ACTION ………………………………………………………74

FOURTH CAUSE OF ACTION …………………………………………………...74

FIFTH CAUSE OF ACTION …………………………………………………...75

PRAYER FOR RELIEF…………………………………………………………75

DEMAND FOR JURY TRIAL…………………………………………………...77

The United States of America brings this action to recover damages from false claims, payment by mistake, and unjust enrichment as a result of the conduct of Community Health Network, Inc. (CHN).  Since at least 2008, CHN knowingly submitted and caused the submission of claims to Medicare that were false because they resulted from violations of the physician self-referral law, 42 U.S.C. § 1395nn (commonly referred to as the "Stark Law").  In doing so, CHN violated the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, was paid by mistake, and was unjustly enriched.

## NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the FCA, and to recover damages under the common law or equitable theories of payment by mistake and unjust enrichment.

2.      This FCA action is based on CHN knowingly submitting or causing the submission of false claims to Medicare from 2008 to at least 2017.  The claims are false because they are for health services that were referred by physicians with whom CHN had compensation arrangements that did not satisfy the requirements of any applicable exception to the Stark Law.  CHN entered into employment relationships with physicians pursuant to which CHN paid the physicians salaries that exceeded fair market value and/or took into account the volume or value of referrals made by the physician.  Thus, the employment relationships did not satisfy any statutory or regulatory exception to the Stark Law.  During the course of these employment relationships, in violation of the Stark Law, the physicians improperly referred patients for designated health services furnished by CHN.  Knowing that claims for those designated health services were false and not eligible for payment, CHN nonetheless submitted or caused to be

1

submitted claims for those services to Medicare.  As a result, CHN received millions of dollars in Medicare reimbursement to which it was not entitled.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).  The Court has jurisdiction to entertain a *qui tam* action pursuant to 31 U.S.C. § 3730(b).

4.      The Court may exercise personal jurisdiction over the Defendant under 31 U.S.C. § 3732(a) because the Defendant is headquartered and transacts business in the Southern District of Indiana.

5.      Venue is proper in the Southern District of Indiana under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendant can be found in, resides in, and/or transacts business in this judicial district.

## THE PARTIES

6.      Plaintiff United States, acting through the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS), administers the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare").

7.      Thomas Fischer (the "Relator") is a resident of the State of Florida.  From October of 2005 to November of 2013, he was employed by CHN as its Chief Financial Officer (CFO).  In December of 2012, he was promoted to serve concurrently as CHN's CFO and Chief Operating Officer (COO).  In those roles, the Relator was responsible for oversight of CHN's finances and operations for CHN's hospitals.  His employment at CHN was terminated in November of 2013.

8.     Defendant CHN is a non-profit corporation headquartered in Indianapolis, Indiana.  CHN is incorporated in the State of Indiana, and its principal place of business is 1500 North Ritter Avenue, Indianapolis, Indiana, which is located in Marion County, Indiana.  CHN and its non-profit and for-profit subsidiaries and affiliates comprise a full-service integrated health delivery system in central Indiana and consist of acute care and/or specialty hospitals, immediate care centers, primary care and specialty employed physicians, ambulatory care centers, freestanding surgery centers, outpatient imaging centers, endoscopy centers, and long term care facilities.  CHN derives a substantial portion of its revenues from federal health care programs, including Medicare, which accounts for approximately one-third of CHN's gross receivables.  CHN and its subsidiaries and affiliates employ hundreds of physicians.  CHN has several former and alternative business names, including but not limited to Community Physicians of Indiana, Community Hospitals of Indiana, Community Hospitals of Indianapolis, and Community Hospital of Indianapolis.  CHN's hospitals that submit claims to Medicare include and have included Indiana Heart Hospital (IHH),[1] Community Hospital North, Community Hospital South, Community Hospital East, Community Hospital of Anderson and Madison County, Community Rehab Hospital North, Community Howard Regional Health, and Community Howard Specialty Hospital.  A more comprehensive list of CHN's providers that appear on CHN's website and submitted claims to Medicare is attached as Exhibit 1.

---

[1]     IHH was jointly owned by CHN and independent physicians, with CHN owning a majority controlling interest.  On January 1, 2009, CHN purchased the ownership interests of the physicians and became the sole member of IHH.  IHH was then renamed Community Heart and Vascular (CHV).  In October of 2014, IHH/CHV merged with CHN.  IHH/CHV was enrolled as a Medicare provider and submitted claims for reimbursement until it merged with CHN.

## LEGAL AND REGULATORY BACKGROUND

### I.    The False Claims Act

9.    The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly submitting or causing the submission of false or fraudulent claims for payment to the United States.  31 U.S.C. § 3729(a).[2]

10.    Claims for reimbursement submitted to Medicare for healthcare services rendered to patients referred by physicians in violation of the Stark Law (as described *infra*) are ineligible for payment and material false claims actionable under the FCA.

11.    The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an

---

[2]    The FCA was amended by Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009.  The Defendant's fraudulent scheme involves false claims submitted before and after that date.  The three pre-FERA subsections that are relevant here are 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7).  The three post-FERA subsections that are relevant here are 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G).  Sections 3729(a)(1) and (a)(7) apply to conduct that occurred before FERA was enacted, and Sections 3729(a)(1)(A) and (a)(1)(G) apply to conduct after FERA was enacted.  By virtue of section 4(f) of FERA, section 3729(a)(1)(B) applies to all claims in this case.

> obligation to pay or transmit money or property to the
>
> Government,
>
> is liable to the United States Government for a civil penalty of not
>
> less than $5,000 and not more than $10,000, as adjusted by the
>
> Federal Civil Penalties Inflation Adjustment Act of 1990 (28
>
> U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount
>
> of damages which the Government sustains[.]

31 U.S.C. § 3729.

12.     Under the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

13.     Under the FCA, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4).

## II.     The Stark Law

14.     Enacted as amendments to the Social Security Act, the physician self-referral law, commonly referred to as the "Stark Law," prohibits hospitals and other entities providing "designated health services" (DHS), as defined in 42 U.S.C. § 1395nn(h)(6) and 42 C.F.R. § 411.351, from submitting to Medicare claims for such services as a result of patient referrals from a physician who has a "financial relationship" (as defined in the statute and regulations)

with the hospital that does not satisfy the requirements of an applicable exception, and prohibits payment of such claims.

15.     The Stark Law was enacted to address overutilization of services, increased costs, and medical decision-making by physicians who stood to profit from referring patients to facilities or entities in which the physicians had a financial interest.

16.     As initially enacted in 1989, the Stark Law applied to referrals of Medicare patients for clinical laboratory services made by a physician to a laboratory with which the physician had a financial relationship unless a statutory or regulatory exception applied.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.  In 1993, Congress extended the Stark Law's application to referrals for additional DHS.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.  In 2008, Congress added outpatient speech-language pathology services to the list of DHS.  *See* Medicare Improvements for Patients and Providers Act of 2008, P.L. 110-275, § 143.

17.     The Stark Law provides that unless an exception under subsection (b) is met, if a physician "has a financial relationship with an entity … then (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made" and "(B) the entity may not present or cause to be presented a claim … or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A)."  42 U.S.C. § 1395nn(a)(1).

18.     "Designated health services" include inpatient and outpatient hospital services, and radiology and laboratory services.  *See* 42 U.S.C. § 1395nn(h)(6).

19.     "Financial relationships" include "compensation arrangements" involving the payment of remuneration directly or indirectly to a referring physician, as defined in 42 U.S.C. § 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

20.     The Stark Law explicitly states that Medicare may not pay for any DHS referred in violation of the statute.  *See* 42 U.S.C. § 1395nn(g)(1).

21.     In addition, the Stark Law regulations expressly require that any entity collecting payment for DHS "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353(d) (2006).

22.     The Stark Law and its companion regulations set forth exceptions for certain financial relationships that meet specific requirements.  These exceptions operate as affirmative defenses to alleged violations of the statute.  To invoke an exception, a defendant must prove compliance with every requirement of that exception.

23.     The Stark Law and its companion regulations set forth exceptions *inter alia* for "*bona fide* employment relationships" and for "indirect compensation arrangements."

24.     To qualify for the exception for *bona fide* employment relationships, a compensation arrangement must meet all of the following requirements:

(A) the employment is for identifiable services;

(B) the amount of the remuneration under the employment—

(i) is consistent with the fair market value of the services; and

(ii) is not determined in a manner that takes into account – directly or indirectly – the volume or value of any referrals by the referring physician;

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer; and

7

(D) the employment meets such other requirements as the Secretary may impose by

regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2); *see also* 42 C.F.R. §§ 411.357(c), 411.354(d)(4).

25.     To qualify for the exception for indirect compensation arrangements, an indirect

compensation arrangement must meet *inter alia* all of the following requirements:

(A) the compensation received by the referring physician (or immediate family member)

described in § 411.354(c)(2)(ii) is fair market value for services and items actually

provided and not determined in any manner that takes into account the volume or

value of referrals or other business generated by the referring physician for the entity

furnishing DHS.

42 C.F.R. § 411.357(p).

26.     An employment relationship that involves a compensation arrangement wherein

the compensation exceeds fair market value or takes into account the volume or value of referrals

made by the physician does not qualify for the Stark Law exceptions for *bona fide* employment

relationships or for indirect compensation arrangements.

27.     Referrals for DHS made by a physician in an employment relationship that does

not qualify for either the exception for *bona fide* employment relationships or for indirect

compensation arrangements (or any other applicable exception) to his or her hospital-employer

are prohibited under the Stark Law.

28.     Under the Stark Law, Medicare does not pay claims for DHS referred by a

physician in an employment relationship that does not qualify for either the exception for *bona

fide* employment relationships or for indirect compensation arrangements (or any other

applicable exception) to his or her hospital-employer.

8

### III.    The Medicare Program

29.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services.  The United States Department of Health and Human Services (HHS) is responsible for administering and supervising the Medicare program, which it does through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

30.    Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A.

31.    The Medicare regulations define a "provider" to include "a hospital . . . that has in effect an agreement to participate in Medicare."  42 C.F.R. § 400.202.

32.    Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

33.    There are four parts to the Medicare Program:  Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care (*see* 42 U.S.C. §§ 1395c-1395i-4); Part B primarily covers outpatient care, including physician services and ancillary services (*see* 42 U.S.C. § 1395k); Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers (*see* 42 U.S.C. § 1395w-21 *et seq.*); and Part D provides prescription drug coverage (*see* 42 U.S.C. § 1395w-101 *et seq.*; 42 C.F.R. § 423.1 *et seq.*).

34.    Since November 2006, CMS has contracted with Medicare Administrative Contractors (MACs) to assist in the administration of Medicare Parts A and B.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative functions on a

regional level.  *See* 42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

35.     Under the Medicare program, CMS (through MACs) makes payments for hospital inpatient and outpatient services on a per-claim basis, and through the year-end cost-report reconciliation process described below.

36.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for reimbursement for inpatient and outpatient services delivered to those beneficiaries.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit claims to Medicare Part A electronically using standard machine readable format developed by the American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12N, which is known as the 837I format.  The claim form instructions, found in Chapter 25, section 75 of the Claims Processing Manual, set forth the Medicare requirements for use of the various codes in completing the form.

37.     When physicians provide patient care services in a hospital setting, whether to hospital inpatients or outpatients, they (or an entity to which they have assigned billing rights) may bill Medicare for their "professional" services, which include performing procedures and interpreting test results, using a CMS Form 1500.  The hospital may submit a separate claim to Medicare for the "technical" or "facility" component of the services rendered, as described in the preceding paragraph, under which the hospital is reimbursed for furnishing, among other things, equipment and non-physician staff.

38.     Providers must be enrolled in Medicare in order to be reimbursed by the Medicare program.  *See* 42 C.F.R. § 424.505.  To enroll in Medicare, institutional providers such as hospitals periodically must complete a Medicare Enrollment Application (often called a Form

10

CMS-855A).  In completing the Medicare Enrollment Application, an institutional provider

certifies: "I agree to abide by the Medicare laws, regulations and program instructions that apply

to this provider.  The Medicare laws, regulations, and program instructions are available through

the Medicare contractor.  ***I understand that payment of a claim by Medicare is conditioned***

***upon the claim and the underlying transaction complying with such laws, regulations, and***

***program instructions (including, but not limited to, the Federal anti-kickback statute and the***

***Stark Law)***, and on the provider's compliance with all applicable conditions of participation in

Medicare (emphasis added)."

39.     The Medicare Enrollment Application also summarizes the FCA in a separate

section that explains the penalties for falsifying information in the application to "gain or

maintain enrollment in the Medicare program."

40.     Medicare enrollment regulations further require providers to certify that they

meet, and will continue to meet, the requirements of the Medicare statute and regulations.

42 C.F.R. § 424.516(a)(1).

41.     As a prerequisite to Medicare payment under Medicare Part A, CMS also requires

hospitals to submit annually a Form CMS-2552, commonly known as a hospital cost report.  A

cost report is the final claim that a provider submits to a MAC for items and services rendered to

Medicare beneficiaries during the year covered by the report.

42.     After the end of a hospital's fiscal year, the hospital files its hospital cost report

with the MAC, stating the amount of Part A reimbursement the hospital believes it is due for the

year, or the amount of excess reimbursement it has received during the year through interim

payments that is owed back to Medicare.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also*

42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether

the hospital is entitled to more reimbursement than already received or whether the provider has

been overpaid and must reimburse Medicare.  *See* 42 C.F.R. §§ 405.1803, 413.60 and

413.64(f)(1).

43.     Medicare Part A reimbursement for hospital services, *see* 42 U.S.C. § 1395ww, is

based on a prospective payment system (Diagnosis Related Groups or "DRGs") using the claims

submitted by the hospital for patient discharges (listed on Form CMS-1450) during the course of

the fiscal year.  On the hospital cost report, the payments for services are added to any other

Medicare Part A add-on payments due to the provider.  This total determines Medicare's liability

for services rendered to Medicare Part A beneficiaries during the course of a fiscal year.  From

this sum, the interim payments made to the provider based on claims it submitted during the year

are subtracted to determine the amount due to or due from the provider.

44.     Every hospital cost report contains a "Certification" that must be signed by the

chief administrator of the provider or a responsible designee of the administrator.

45.     That chief administrator or designee is required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost
>
> report] is a true, correct and complete statement prepared from the
>
> books and records of the provider in accordance with applicable
>
> instructions, except as noted.  I further certify that I am familiar
>
> with the laws and regulations regarding the provision of health care
>
> services, and that the services identified in this cost report
>
> were provided in compliance with such laws and regulations.

46.     The hospital cost report certification page also includes the following notice:

12

> Misrepresentation or falsification of any information contained in
> this cost report may be punishable by criminal, civil and
> administrative action, fine and/or imprisonment under federal law.
> Furthermore, if services identified by this report were provided or
> procured through the payment directly or indirectly of a kickback
> or where otherwise illegal, criminal, civil and administrative
> action, fines and/or imprisonment may result.

47.     Thus, a provider must certify (1) that the filed hospital cost report is truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) that it is correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) that it is complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Law.

48.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its MAC.

49.     Medicare, through its MACs, has the right to audit a provider hospital's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  *See* 42 C.F.R. § 413.64(f).

50.     Since 2011, Wisconsin Physicians Service Insurance Corporation acts as the MAC for Indiana (and Michigan).  National Government Services preceded Wisconsin Physicians Service Insurance Corporation.

13

## THE DEFENDANT'S FRAUDULENT SCHEME

51.    Beginning in 2008 and 2009, particularly after Bryan Mills became CHN's Chief Executive Officer (CEO), CHN embarked on an aggressive campaign to recruit physicians for employment.  CHN successfully employed hundreds of physicians, including in the specialties of breast surgery, cardiology (including the subspecialties of invasive cardiology, electrophysiology, and general cardiology), cardiothoracic surgery, vascular surgery, orthopedic surgery, pulmonary medicine, sleep disorders medicine, obstetrics and gynecology, and primary care medicine.  CHN referred to the successful employment of these physicians as "integrations."  CHN recruited physicians from the local Indianapolis market many of whom already had staff privileges, practiced at, and/or referred patients to a CHN hospital or affiliated facility.  These integrations were "defensive" in nature, meaning that CHN recruited and employed these physicians to secure their referrals and out of concern that their referrals would "leak" to CHN's local competitors, including St. Vincent Indianapolis, Indianapolis University Health/Clarian Health, and St. Francis Health Center.  CHN openly discussed the vital importance of "capturing downstream revenues" and "downstream referrals," especially referrals for lucrative "high end" imaging (*i.e.*, radiology) studies.

52.    CHN successfully recruited these hundreds of physicians by offering and paying salaries that were significantly higher than what the physicians were receiving through their own private practices and well above fair market value.  In many cases, the salaries were magnitudes higher than what the physicians were receiving on their own.  For example, CHN essentially doubled the salaries of all of the cardiovascular specialists (cardiologists, cardiothoracic surgeons, and vascular surgeons).  For each specialty group, CHN calculated, based on the physicians' historical referral and utilization patterns, the "hospital reimbursement differential."

Medicare reimburses hospitals more for many services, including, for example, radiology services, when they are furnished in a hospital instead of a physician office.  Thus, CHN stood to receive more from Medicare for the same services after the physicians became employees, as CHN would be furnishing those services and receiving higher reimbursement than the physicians received when those services were performed by the physician practice.  That increase in reimbursement for the same service was what CHN referred to as the "hospital reimbursement differential" and used to fund the excessive physician salaries.

53.     Upper level management at CHN, including Mills, were well aware of the requirements of the Stark Law, including the requirements that the compensation of employed physicians be fair market value and not determined in a manner that takes into account the value or volume of referrals.  To that end, CHN engaged a valuation firm, Sullivan Cotter & Associates (Sullivan Cotter), to analyze the salaries that CHN intended to pay and did pay the recruited physicians.  Sullivan Cotter analyzed and prepared at least nine formal opinions of the compensation CHN intended to and did pay to physician specialty groups.  CHN retained Sullivan Cotter for the express purpose of analyzing and preparing opinions on "whether the proposed compensation represent[ed] FMV [fair market value] … under … the Stark Law."  In those opinions and correspondence, Sullivan Cotter repeatedly made clear to CHN its general rule that in order for compensation to be presumptively within the range of fair market value, the compensation needed to be less than the 75th percentile of national benchmark salary data or the compensation per productivity (measured by physician work units or collections) needed to be less than the 60th percentile of national benchmark salary data.   When neither of these criteria was met, the compensation paid to a particular physician was deemed by Sullivan Cotter to be outside the range of fair market value but could nonetheless be justified based on the presence

15

and documentation of certain "business judgment factors," such as the individual accomplishments of the physician, his/her leadership and business development skills, and the community need for the services.  Such justifications, however, were to be reserved for exceptional circumstances.  Despite the repeated and clear guidance it received from Sullivan Cotter, CHN set the physicians' salaries by "backing into" the 90th percentile of national benchmark data.  Moreover, CHN did not provide Sullivan Cotter with accurate compensation information.  For example, in the case of the breast surgeons, CHN knowingly inflated the collections figures it provided to Sullivan Cotter to induce a favorable opinion.  And in the case of the neurosurgeons, CHN knowingly provided Sullivan Cotter with falsely deflated compensation figures and did not disclose salary guarantees.

54.     CHN knew that it was paying salaries that exceeded fair market value in violation of the Stark Law.  Sullivan Cotter was not the only valuation expert to analyze compensation for CHN.  In 2013, CHN retained Katz Sapper & Miller (KSM) to analyze the compensation that CHN had paid its physicians in 2012 and the first half of 2013.  KSM concluded that the compensation was "high compared to productivity in all specialties and primary care."  When KSM transmitted its findings to CHN, KSM characterized the compensation figures as "staggering."  And upon receiving those findings, CHN's upper level management similarly characterized those figures as "staggering" and "astounding."  By way of example, KSM concluded that the compensation and compensation per productivity for the cardiologists, electrophysiologists, invasive cardiologists, and vascular surgeons were above the 90th percentile.  Despite these findings, CHN continued to pay its physicians salaries that it knew were well above fair market value and continued to submit claims to Medicare for designated health services referred by the physicians in direct violation of the Stark Law and FCA.

55.     In addition to paying its physicians salaries that exceeded fair market value and submitting claims to Medicare for designated health services referred by those physicians, CHN also conditioned awarding incentive compensation to its physicians on the physicians meeting a target of "hospital downstream revenue specific to the physician."   In doing so, CHN determined the physicians' compensation in a manner that took into account the volume or value of referrals to CHN.  CHN knew that one of the requirements of the applicable exceptions to the Stark Law was that the compensation not take into account the volume or value of referrals but nonetheless submitted claims to Medicare for designated health services referred by the physicians in direct violation of the Stark Law and FCA.

## I.     CHN's Employment of the Breast Care Surgeons

56.     On April 6, 2009, CHN formed Community Breast Care (CBC), a breast care and surgical practice.  CBC originally employed five physicians:  Timothy Goedde, Cara Hahs, Christina Kim, Susan "Chase" Lottich, and Nate Thepjatri.  Each of these five physicians executed his/her employment contract with CHN on March 13, 2009.

57.     Before joining CHN, Drs. Hahs and Lottich practiced together at the Center for Women's Health on the south side of Indianapolis.

58.     Before joining CHN, Drs. Goedde, Kim, and Thepjatri practiced together at the Midwest Breast Center on the north side of Indianapolis.

59.     The "Breast Care Integration," as CHN referred to the recruitment and employment of these physicians, was a defensive measure aimed principally at securing referrals from the surgeons, who were already practicing in the area.

60.     By employing these physicians, CHN would lock up their referrals, as the physicians would, after becoming CHN employees, necessarily make all of their referrals within

the network (subject to limited statutorily mandated exceptions), rather than to CHN's competitors.

61.     According to the September 8, 2008 "Breast Care Integration Concept Document," which sets forth the mission, structure, and financing of the Breast Care Integration, the integration was defensive and driven by a desire to stop a loss of referrals.  The document states that CHN had concerns that there was "leakage [of referrals from these physicians] from CHN[]" to its competitors, including "Clarian and St.Vincent's."

62.     In particular, CHN sought to lock up the referrals of ancillary services, especially radiology and imaging services.

63.     A January 8, 2009 document summarizing "Open Items" refers to the financial considerations of the Breast Care Integration, which include "ROI" [return on investment] and "Greater capture of ancillary revenues – especially high end imaging, radiation and medical oncology."  On his copy of that document, Mills wrote in " – Network Capture of Downstream Rev[enues]."

64.     According to a presentation titled, "Breast Care Integration," made to CHN's Finance Committee on December 19, 2008, two of four the "Drivers" for the integration by CHN were "Ancillary service capture" and the opportunity for "Market growth."

65.     A similar presentation titled, "Breast Care Integration," made to CHN's Physician Integration Council on January 29, 2008, cites to "Ancillary service and downstream revenue capture" as reasons for "Why Integration?" and "Why Now?"

66.     As part of its due diligence, CHN focused on the revenues it anticipated locking up from referrals from the breast surgeons for ancillary services, as it would use those revenues to finance the integration, including paying the salaries of the physicians.

67.     The Breast Care Integration Concept Document lists the sources for financing the integration.  The list includes "captur[ing] ancillary services leaving the network such as high end imaging, medical and radiation oncology" and "better reimbursement on ancillary services" referred by the physicians.

68.     "[B]etter reimbursement on ancillary services" was a reference to what CHN called the "hospital reimbursement differential," "ancillary service differential," "provider-based reimbursement differential," "shared income piece," and "upside."

69.     Mike Butler, a consultant CHN retained to assist with the integrations of several specialty groups, including performing analyses of physician compensation, explained the hospital reimbursement differential as follows (in the context of the integration of the cardiologists, cardiothoracic surgeons, and vascular surgeons):  "Hospitals … receive significantly higher reimbursement compared to physician practice reimbursement for cardiac testing services (*e.g.*, echocardiography and cardiac nuclear imaging studies) and modestly higher reimbursement for the professional services of CV [cardiovascular] Physicians.  The reimbursement differential is the excess of the … hospital reimbursement for the same services [provided] in the physician practices."

70.     Thus, because Medicare reimburses more for many services (including, for example, ancillary services such as radiology and imaging services) when they are furnished in a hospital instead of a physician office, CHN stood to receive more from Medicare for the same services after the physicians became CHN employees, as CHN would be furnishing those services and receiving higher reimbursement than the physicians received for those services when they were performed by the physician practice.  That increase in reimbursement for the

same services was what CHN referred to as the "ancillary service differential,"[3] "hospital reimbursement differential," "provider-based reimbursement differential," "shared income piece," and "upside."

71.    CHN, with guidance from Butler, calculated the ancillary service differential for physicians involved in the Breast Care Integration.  It did so using the following data, which Butler had outlined for Jane Callahan, CHN's Vice President of Physician Services, in an email dated November 19, 2008:

- CWH [Center for Women's Health] and MBC [Midwest Breast Center] practice required – Need from each practice:  (1) Number of radiology procedures by CPT code together with charges and reimbursement by CPT code; Practice payer mix-

- Network (*i.e.*, CHN and CHS) data required – Need Network:  (1) Charges by breast care radiology procedure CPT code; (2) Medicare and Medicaid charges and reimbursement by breast care radiology procedure CPT code; and (3) % of charges reimbursement percentage by Network payer.

72.    CHN calculated the ancillary service differential because the revenues CHN anticipated receiving from the differential were used to fund the integration and pay the physicians their salaries.  In fact, CHN determined the physicians' salaries based on the ancillary service differential.

---

[3]    The term "ancillary service differential" is a bit misleading, as the differential was actually based on more than just ancillary services.  It included, for example, professional services, as explained by the Butler email referenced above.

73.     By email dated November 14, 2008, Callahan requested that CHN's Finance Office "quantify the delta between MD and Hospital reimbursements for professional and technical fees" [*i.e.*, the ancillary service or hospital reimbursement differential] and "the split of [the] upside – hospital/MD – for compensation calculations."  Mills was copied on the email.

74.     In response to a request for clarification as to what she meant by the "upside – hospital/MD," Callahan explained:

> The difference between the hospital reimbursement on professional and technical fees – the doctors want some split of that between docs and hospital – so they enjoy some of the upside also – we will want to calculate that variable into wRVU compensation rate or as some other adjuster to compensation, assuming we are willing split.  Should be noted that this is how we fund the deal – so there may be limited or no[] split with MDs pending financial analysis.[4]

75.     CHN typically compensated its employed physicians based on a set rate of dollars per wRVUs performed by the physician.  As Callahan explained in her email and as set forth in detail *infra*, CHN set the compensation per wRVU at a rate that incorporated the revenues from ancillary service referrals CHN anticipated receiving from the physicians.  As a result, the salaries exceeded fair market value, and the DHS referrals from the physicians to CHN violated the Stark Law.

---

[4]     "wRVU" is an acronym for "work Relative Value Unit."  wRVUs represent the relative amount of physician work, resources, and expertise necessary to provide a service to a patient, and serve as a productivity metric for work performed by physicians.

76.     CHN calculated the ancillary service differential, found that it was substantial, and shared the differential with the physicians by inflating their compensation per wRVU accordingly.

77.     Using the 20 most often ordered and/or performed procedures for the physicians, CHN determined that the differential for 2008 for the Center for Women's Health physicians, Drs. Hahs and Lottich, was $3,138,219.

78.     In a December 9, 2008 email regarding the presentation of the Breast Care Integration to CHN's Finance Committee, Callahan wrote:  "the ancillary differential is significant and will be a means to finance this endeavor."

79.     The physicians knew that the ancillary service differential would fund the integration and expected a share of the differential.

80.     A draft document titled "Employment considerations" states (under the subheading "Compensation Plan") that "Tim [Dr. Goedde] believes there should be some sharing/credit for ancillary services – *i.e.*, [Dr. Lottich] gets all ancillary revenue from services but he [Dr. Goedde] would rather work in conjunction with/integrate with the network, but expects some sharing of those revenues."

81.     Another version of that same document states:  "Dr. Thepjatri and Dr. Kim are currently at $250K each … But [Dr. Goedde] is advocating for more … said that all three of them at $400K each to reflect revenue and value that is generated because of their practice – MRI, Surgery, etc."

82.     The parties referred to compensating the physicians for their ancillary service referrals as "shared income."  On November 29, 2008, Dr. Goedde wrote to Callahan:  "[J]ust to clarify the shared income piece … the 60/40 was meant that the "60" goes to CWH [Center for

Women's Health] and the "40" goes to MBC [Midwest Breast Center].  Jane [Callahan]

suggested looking at it from 60/40 or 75/25… I believe that the most fair way is to split the

shared income 50/50 between the two groups."  Goedde added: "These figures certainly do

represent more income as promised [by CHN] than being in private practice, so I do think we've

accomplished that goal."

83.    On December 17, 2008, Butler delivered a compensation analysis to Callahan and

Mills.  The analysis included the compensation per wRVU rates for each of the five physicians,

as well as their anticipated wRVUs and compensation for the next five years.  Butler's cover

email notes that if the physicians are getting "50% or more" of the hospital reimbursement

differential, "I don't think the physicians can reasonably object."  He goes on to note that

"[r]egardless of the split … the physicians will realize a significant increase in their

compensation."  Butler also writes that the proposed compensation for the physicians "is

approaching the fair market value ceiling based on …90th percentile compensation per WRVU

statistics."  Finally, Butler writes that his analysis can be sent to Sullivan Cotter, a valuation firm

retained by CHN in connection with its integrations, to evaluate physician compensation for fair

market value and reasonableness for purposes of compliance, among other things, with the Stark

Law.

84.    According to Sullivan Cotter, however, the fair market value ceiling for physician

compensation was not the 90th percentile.  Rather, Sullivan Cotter generally viewed the fair

market ceiling for physician compensation to be the 75th percentile for total cash compensation

and the 60th percentile for total cash compensation relative to physician productivity.

85.    CHN knew that, according to Sullivan Cotter, the fair market value ceiling was

generally the 75th percentile for total cash compensation and the 60th percentile for total cash

compensation relative to physician productivity and that the proposed compensation for the breast surgeons exceeded those thresholds.

86.     On December 19, 2008, Callahan sent Butler's analysis, including the proposed physician compensation, to Sullivan Cotter for a fair market value and reasonableness evaluation.

87.     On February 3, 2009, Sullivan Cotter sent its "Summary of Fair Market Value and Reasonableness Evaluation for Breast Care Integration" to CHN.  The Summary set forth the conclusions of Sullivan Cotter's evaluation of, among other things, whether the compensation CHN planned to pay the physicians was fair market value and reasonable.

88.     The Summary was "intended as an analysis of whether the proposed compensation represents FMV as defined under the provisions of the Stark Law."

89.     In order to determine whether the proposed physician compensation was fair market value and reasonable, Sullivan Cotter evaluated each physician's anticipated annual compensation for the next five years, along with his or her anticipated productivity (*i.e.*, wRVUs) relative to blended data from three national salary surveys (Sullivan Cotter, Medical Group Management Association, and American Medical Group Association) of physicians of the same specialty.  Sullivan Cotter noted that these surveys "include the market segments of interest to CHN," physicians in group practices and employed by hospitals and medical centers, and contain "both national and regional market data."

90.     In evaluating the proposed compensation, Sullivan Cotter employed a two-step test, which was consistent with its approach in other evaluations.  First, Sullivan Cotter evaluated the proposed compensation relative to the blended national market data.  If the total cash compensation, or "TCC," paid to the physician was less than the 75th percentile of the national

market data, then Sullivan Cotter concluded that the compensation was consistent with fair

market value and reasonable.  If, however, the TCC exceeded the 75th percentile of the national

market data, Sullivan Cotter would perform a second step in its analysis, and evaluate whether

the TCC could be supported by productivity.  For this second step, Sullivan Cotter would

evaluate the TCC per wRVUs.  If the TCC per wRVUs were "at or below the 60th percentile of

the market" data, then Sullivan Cotter concluded that the compensation was consistent with fair

market value and reasonable.

91.     Where Sullivan Cotter could not conclude that compensation was consistent with

fair market value and reasonable under either of the first two steps, they sometimes would

employ a third step, and evaluate whether the TCC could be supported by "collections for

professional services."  For this step, Sullivan Cotter would evaluate the TCC per collections

(*i.e.*, revenues) for personally performed professional services ratio.  If the TCC per collections

was "at or below the 60th percentile of the market" data, then Sullivan Cotter concluded that the

compensation was consistent with fair market value and reasonable.  According to Sullivan

Cotter, the TCC per collections of professional services ratio was "commonly used as a measure

of work effort when systems to report wRVUs are not in place."

92.     The Sullivan Cotter Summary states (in bold):  "**Compensation levels supported

by TCC to clinical productivity ratios [*i.e.*, wRVUs or collections] up to the 60th percentile

of the market are generally considered to be within competitive norms, reasonable, and

consistent with fair market value**."

93.     Under the first step of its evaluation, Sullivan Cotter concluded that the TCC

CHN intended to pay the physicians was at the 97th percentile of the market data, well above the

75th percentile needed to be deemed by Sullivan Cotter to be consistent with fair market value and reasonable.

94.     Under the second step of its evaluation, Sullivan Cotter concluded that the TCC per wRVUs was at the 84th percentile of the market data, well above the 60th percentile needed to be deemed by Sullivan Cotter to be consistent with fair market value and reasonable.

95.     Because the proposed compensation could not be justified under either of the first two steps, Sullivan Cotter performed the third step, and evaluated the TCC per collections ratio. Sullivan Cotter typically only used this ratio where wRVU data were not available, but Sullivan Cotter did so here even though CHN had in place a system for physicians to report their wRVUs.

96.     As Sullivan Cotter was evaluating proposed compensation, it had to use anticipated collections figures.  CHN's anticipated collections for the integration were estimated based on the collections from CWH and MBC for 2008.  Sullivan Cotter explained in its Summary:  "[we] used the Group's FY2008 collections as an estimate of professional collections in Year 1 of the compensation plan.  We did not project collections in subsequent years … as collections can be affected by a number of factors."

97.     Relying on the collections figure for professional services (anticipated for the first year post-integration) that was provided to it by CHN, $4,801,000, Sullivan Cotter concluded that the TCC per collections ratio was at the 56th percentile of the market data, and that the compensation – for the first year only – "falls within the bounds of FMV."  As set forth in greater detail *infra*, CHN knowingly and improperly inflated the $4,801,000 collections figure by including in it collections for technical fees.

98.     Sullivan Cotter warned CHN (in bold) that "**drastic changes in … collections could change the conclusions set forth above.  This is particularly true in years 2 through 5**

26

**of the compensation plan, as market conditions cannot be reliably predicted, especially as it relates to reimbursement**."

99.    Based on Sullivan Cotter's evaluation, and in particular on its conclusion that the compensation for the first year following the integration could be supported based on collections for professional services, the CHN Board of Directors approved the integration and the compensation plan.

100.    Jim Morey, a member of CHN's Board and Compensation Committee, notified Callahan and Mills of the Board's approval by email on February 15, 2009:  "I have reviewed the Sullivan Cotter document and am comfortable proceeding with the breast integration plan. Inherent in my comfort level is the assumption that … the ratio of total cash compensation to total cash collections will … remain relatively stable.  I suggest that management provide an annual recap of this ratio for future compensation committee review in contract years 2-5." Morey and the Board understood that Sullivan Cotter rendered a favorable opinion only for the first year of the integration and did so solely on the basis of collections.

101.    Mills was well aware of the basis of the Board's approval and of Morey's recommendation for an "annual recap," as Mills printed, underlined, and placed a star next to the passage quoted above.  In his personal notes attached to Morey's email, Mills wrote "Annual Update – Ratio of Total Cash Compensation To Total Cash Collections."  CHN did not, however, "provide an annual recap of [the] ratio" to the Compensation Committee for subsequent years.

102.    Sullivan Cotter's Summary was "based on information provided by CHN." Sullivan Cotter did not "independent[ly] validate" that information.

103.    During testimony provided on May 9, 2018 by Renee Stolis of Sullivan Cotter, who performed several fair market evaluations of physician compensation for Sullivan Cotter,

Stolis was asked whether there was an "understanding by Sullivan Cotter that the information that Community Health provided to [Sullivan Cotter] was accurate, complete and truthful …" Stolis responded:  "Yes."

104.    The information that CHN provided to Sullivan Cotter was not in fact accurate or truthful.

105.    CHN falsely inflated the $4,801,000 collections for personally performed professional services figure upon which Sullivan Cotter had based its favorable opinion.

106.    The $4,801,000 collections figure was false because it included collections for technical services, in addition to personally performed professional services.

107.    Approximately $1,300,000 of the $4,801,000 collections figure represented collections from CWH (Drs. Lottich and Hahs) that were for technical services, such as the technical component of radiology services that they performed in their practice.

108.    CHN knew that the $4,801,000 collections figure included collections from technical services.

109.    When Holly Millard, of CHN's Finance Office, transmitted the collections figures from CWH and MBC to Callahan and Butler, Millard expressly noted that the collections included both professional and technical service collections.

110.    Mills knew that the collections figures provided to Sullivan Cotter included collections of technical services.  On his copy of a document titled, "CWH and MBC Combined Profit Loss Statements," and which estimates collections from professional services at $4,927,172, Mills wrote "-> Separate Radiology From Non-Radiology".

111.    CHN did not "separate" or back out collections from technical services from the $4,801,000 collections figure it provided to Sullivan Cotter.

112.     Had CHN backed out the approximately $1,300,000 of collections of technical services from the $4,801,000 figure, Sullivan Cotter would have not have concluded that the proposed compensation "falls within the bounds of FMV."

113.     CHN also knew that the collections figure should have been limited to personally performed professional services only.

114.     During testimony provided on May 9, 2018, Sullivan Cotter's Stolis was asked: "Let's talk a little bit more about the … collections being limited to personally performed services… Did you ever discuss that with Community Health?"  Stolis responded:  "It was clear, I believe in our requests for information and in the dialogues that we had, yes."

115.     Indeed, a February 10, 2009 analysis by Sullivan Cotter of the compensation of CHN physician David Carnovale explains that (1) "Collections market data … does not include collections for ancillary services …" and (2) "when calculating CHN's TCC/Collections ratio, we have included all components of cash compensation, however excluded the projected collections related to the provision of ancillary services to ensure an accurate comparison to the [national salary] benchmark data."

116.     By knowingly falsely inflating the collections for professional services figure, CHN induced Sullivan Cotter to render a favorable conclusion on the fair market value and reasonableness of the proposed compensation in year one.

117.     The actual collections for professional services for the first year of CBC turned out to be $3,468,141, significantly less (*i.e.*, approximately $1,300,000 less) than the knowingly falsely inflated $4,801,000 figure upon which CHN had Sullivan Cotter base its conclusion.

118.     Mills did not inform the Board that the collections for personally performed professional services were significantly less than anticipated, and significantly less than the

figure upon which Sullivan Cotter based its conclusion, even though Mills knew that the Board's "comfort level" with the compensation was based on the assumption that "the ratio of total cash compensation to total cash collections [would] … remain relatively stable."

119.     On May 8, 2018, CHN Board member and voting Compensation Committee member Russell Swan provided testimony during which he was asked whether "based on your understanding[] of … the Stark Law, in assessing proposed compensation of physicians, would it be appropriate to consider collections related to ancillary services?"  Swan responded: "No."

120.     During that May 8, 2018 testimony Swan was also asked "[w]ould you have been comfortable voting in favor of proposed compensation to physicians that … had been presented to you as acceptable based on collections data that included ancillary services collections?" Swan responded:  "No."

121.     By virtue of their employment agreements, CHN and the breast surgeons had compensation arrangements under the Stark Law.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

122.     During the term of these agreements, the breast surgeons made DHS referrals to CHN, including referrals for inpatient and outpatient hospital services, for which CHN submitted claims to and received payments from Medicare.

123.     CHN's compensation arrangements with the breast surgeons did not qualify for an applicable exception to the Stark Law because the compensation paid by CHN to the breast surgeons exceeded fair market value.  *See* 42 U.S.C. § 1395nn(e)(2)(B)(i); *see also* 42 C.F.R. § 411.357(c)(2)(i).

124.     Examples of years during which the compensation paid by CHN to the breast surgeons exceeded fair market value include (but are not limited to) the following:

30

- Goedde:  2012 and 2017

- Hahs:  2009

- Kim:  2009 and 2012

- Lottich:  2009 and 2012

- Thepjatri:  2009 and 2012

125.    CHN's submission of claims to Medicare for DHS that were referred by the breast surgeons therefore violated the Stark Law.

126.    Examples of claims that CHN submitted to Medicare for DHS that were referred by the breast surgeons in violation of the Stark Law can be found on Exhibit 2.[5]

## II.    CHN's Employment of the Cardiovascular Specialists

127.    In January of 2009, CHN announced the formation of "CV Newco," a reworking of the ownership and employment relationships between CHN, IHH, two cardiovascular medical groups (Indiana Heart Associates (IHA) and Indiana Cardiac & Vascular Consultants), and several cardiovascular specialists.

128.    IHH was located at 8075 North Shadeland Avenue, Indianapolis, IN 46250, and did business as "The Indiana Heart Hospital."  Thomas Malasto was IHH's CEO.

129.    IHH had previously been jointly owned by CHN and independent physicians, with CHN owning a majority controlling interest.

130.    On January 1, 2009, CHN purchased the ownership interests of the physicians and became the sole member of IHH/CV Newco.  The registered corporate name of IHH/CV Newco

---

[5]    Exhibits 2-5 list specific examples of false claims submitted to Medicare by CHN.  As these exhibits contain confidential patient-related information, they were filed with redactions. Unredacted copies of these exhibits were served upon the defendant.

was "The Indiana Heart Hospital, LLC."  After the purchase, IHH/CV Newco became a wholly owned subsidiary of CHN.

131.    After the purchase, IHH/CV Newco continued to do business as "The Indiana Heart Hospital," and Malasto continued as its CEO.

132.    Under the new arrangement, IHH/CV NewCo would employ 34 physicians – 27 cardiologists, 3 cardiothoracic surgeons, and 4 vascular surgeons (collectively hereinafter referred to "cardiovascular specialists").

133.    In September of 2012, IHH/CV Newco changed its d/b/a name from "The Indiana Heart Hospital" to "Community Heart and Vascular Hospital."

134.    In October of 2014, IHH/CV Newco merged with CHN, but continued to operate at its 8075 North Shadeland Avenue address.

135.    IHH/CV NewCo was enrolled as a Medicare provider (Medicare Provider Number 15-0154) and submitted claims for reimbursement until it merged with CHN.

136.    On August 18, 2014, in anticipation of the merger, CHN notified Medicare Provider Enrollment that Community Health Network, Inc. was adding a new practice location, that of IHH/CV Newco, which operated under Medicare Provider Number 15-0154, to Community Health Network, Inc.'s Medicare Provider Number 15-0074, effective October 1, 2014.  CHN also requested that IHH's Medicare Provider Number 15-0154 be terminated effective October 1, 2014.  Those changes took effect in October of 2014.

137.    The Articles of Cross-Species Merger of IHH/CV Newco with and into CHN, which were filed and approved by the Indiana Secretary of State, were signed on behalf of IHH/CV Newco, the "Merging Entity," by Bryan Mills, IHH/CV Newco's President, and on behalf of CHN, the "Surviving Entity," also by Bryan Mills, CHN's President.

138.    Following the merger, IHH/CV Newco ceased to exist as a separate corporate entity and its financial results were consolidated with CHN's.

139.    An audit report of CHN's consolidated financial statements for 2013 and 2014 states that "[w]hile always consolidated in the Network [CHN], effective October 1, 2014, the Indiana Heart Hospital, LLC ("CHVH") was merged into CHN[]" and that IHH's "financial results are consolidated with CHN[]'s financial results beginning October 1, 2014."

140.    In late 2008, employment contracts were executed by IHH/CV Newco with the cardiovascular specialists.  (Hereafter, IHH/CV Newco, which, as is set forth above, was a wholly owned subsidiary of CHN and merged into CHN in October of 2014, and CHN, shall be referred to as "CHN" in the context of their employment of the cardiovascular specialists and submission of claims to Medicare for referrals by those cardiovascular specialists.)

141.    Prior to the contracts' execution, most of the cardiovascular specialists were employed by IHA, of which Anthony Javorka was the CEO and Ram Yeleti was the President. Following the integration, Javorka was hired to be the CEO of Community Physicians of Indiana (CPI), a subsidiary of CHN, and Yeleti was hired to be the President of CPI.

142.    After the integration of the cardiovascular specialists, they practiced at IHH and Community Hospitals North, East, and South.

143.    In setting the compensation for the cardiovascular specialists, CHN sought to and did pay them at the 90th percentile of national market data.

144.    CHN used the hospital reimbursement differential, *i.e.*, revenues derived from referrals from the physicians for ancillary and technical services, to pay the excessive physician compensation.

145.    CHN set the compensation rates (*i.e.*, comp/wRVU) for each specialty – the cardiologists, vascular surgeons, and cardiothoracic surgeons – based on the anticipated revenues from ancillary and technical service referrals from each specialty.

146.    In a January 22, 2008 email exchange discussing the comp/wRVU rate at which CHN would pay the cardiologists, vascular surgeons, and cardiothoracic surgeons, Yeleti wrote to Javorka:  "Tom [Malasto, IHH's CEO] believes that the Vascular Surgeons might be as much as the Cardiologists but I told him he would need to convince us since we [*i.e.*, the IHA cardiologists] are the ones bringing the testing revenues."

147.    Javorka responded:  "It would be good to know what the starting point is for all MDs and then what it is that each contributes to the new entity.  However, one could argue that all of the new money should go to the Cardiologists as it is the testing that is funding the venture. In reality, this [*i.e.*, all new money going to the Cardiologists] would not work.  I will look at the 90th percentile by provider and see what the $/wRVU is then try to back into it from there."

148.    Butler's consulting firm, Essentia Health Consulting (EHC), was retained by CHN and the cardiovascular specialists to assist with the integration and setting the physician compensation.  EHC represented both CHN and the cardiovascular specialists with the integration.

149.    As he did with the Breast Care integration, Butler calculated the hospital reimbursement differential for the cardiovascular specialists, to determine how much revenue from referrals of ancillary and technical services would be available to fund the physician compensation.

150.    As part of his analysis, Butler compared the compensation that the cardiovascular specialists actually received in 2007 (*i.e.*, before the integration), with what they would have

34

received in 2007 based on the rate at which CHN was proposing to pay them. That analysis, dated August 8, 2008 and titled "Summary – Comparison of 2007 Actual To 2007 Pro Forma CV Physician Compensation," provides the following:

      a. The cardiovascular specialists collectively received $13,221,000 in compensation in 2007.

      b. Under CHN's proposed compensation rate, the cardiovascular specialists would have received $24,314,000 for the same work, an increase of $11,093,000, or 84%.

      c. The hospital reimbursement differential was $10,560,000, and would fund almost all of the increase (*i.e.*, $11,093,000) in the collective physician compensation.

151.    A presentation titled "CV Integration Plan," which was made on February 12, 2008 to the cardiovascular physicians, states that the physician compensation plan would undergo a "[t]hird party reasonableness review" which is "[r]equired for compliance with Medicare anti-kickback, Stark anti-referral and IRS private inurement laws and regulations." The presentation further states that the "[s]um of Aggregate Compensation and cash benefits cannot exceed current FMV ceiling."

152.    The presentation attendees included Yeleti, Malasto, and Mark Dixon, CHN's COO.

153.    CHN's proposed compensation rate for the cardiologists was 10% higher than for the vascular surgeons. Butler explained that the "10% premium" was based in part on the fact that the cardiologists "account for 93% of the CV NewCo outpatient technical net revenues that

finance the increase in the CV Physician compensation" while the vascular surgeons account for merely 7% of those revenues.

154.    Butler also prepared a comparison of the average compensation, by specialty (*i.e.*, cardiology, cardiothoracic surgery, and vascular surgery), that the physicians received in 2007 with the estimated average compensation that the physicians would receive in 2009 under CHN's proposed compensation plan.  Butler shared his comparison with Malasto and Javorka.

155.    Butler's comparison showed that the average actual compensation for the cardiologists in 2007 was $397,000 per physician.  Under CHN's compensation plan, the average estimated compensation for the cardiologists in 2009 would be $803,000 per physician, an increase of 102%.

156.    Butler's comparison showed that the average actual compensation for the cardiothoracic surgeons in 2007 was $323,000 per physician.  Under CHN's proposed compensation plan, the average estimated compensation for the cardiothoracic surgeons in 2009 would be $665,000 per physician, an increase of 106%.

157.    Butler's comparison showed that the average actual compensation for the vascular surgeons in 2007 was $461,000 per physician.  Under CHN's proposed compensation plan, the average estimated compensation for the vascular surgeons in 2009 would be $889,000 per physician, an increase of 93%.

158.    According to a July 24, 2008 presentation titled, "CV Integration Summary," CHN conditioned the integration on "receipt by the Network of one or more favorable FMV review opinions from an independent valuation expert."

159. In June of 2008, CHN and the cardiovascular specialists, with Butler's assistance, began to shop for a valuation expert to review the proposed compensation rates for fair market value and reasonableness.

160. Butler initially contacted Value Management Group (VMG). In an email to the parties, including Mills, Butler cited several "red flags," including the fact that VMG conditioned a physician's eligibility on receiving compensation at the 90th percentile on the physician's "CV, clinical research publications, and historical WRVU productivity." CHN and the cardiovascular specialists concluded that VMG was "unduly conservative" and decided not retain them.

161. Butler then contacted LarsonAllen. In an email to the parties, including Mills, Butler noted that LarsonAllen did "not appear to have physician eligibility requirements for purposes of a physician qualifying for the 90th percentile as his/her FMV Ceiling." CHN and the cardiovascular specialists therefore decided to retain LarsonAllen.

162. The parties engaged LarsonAllen "to perform a limited, preliminary FMV Review of the Compensation Plan…" In an email to the parties, Butler explained:

> If the Network [CHN] and the CV Physicians conclude that the LarsonAllen methodology and preliminary assessment are reasonable, the Network currently plans to engage LarsonAllen to perform a comprehensive FMV Review of the Compensation Plan, including a FMV Review opinion. If the Network and the CV Physicians decide to engage LarsonAllen to perform a comprehensive FMV Review, the Network may want to separately engage SCA [Sullivan Cotter] as well. We may want SCA to review the LarsonAllen methodology and, possibly, review the LarsonAllen FMV Review Opinion on behalf of the Network Compensation Committee.

163.    Butler sent CHN's proposed compensation plan to LarsonAllen on July 25, 2008, and an updated plan on July 29, 2008.  The plan included a proposed comp/wRVU for base compensation, as well as incentive compensation based on a target level of wRVUs and retention compensation for each of the three specialties.

164.    On August 1, 2008, LarsonAllen provided a preliminary opinion to the parties. The preliminary opinion included certain assumptions, including that there would be a fair market value cap of the 75th percentile for base compensation and a fair market value cap of the 90th percentile for base, incentive, and retention compensation.  The preliminary opinion states that "[w]e would expect that our recommendations concerning compensation caps would be incorporated into the [compensation] plan."

165.    LarsonAllen explained the rationale for these assumptions in an email to Butler. With respect to the fair market value ceiling of the 75th percentile for base compensation LarsonAllen explained:  "If you compensate at the 90th %tile per WRVU for base compensation[,] you have no room for retention and incentive compensation.  90th %tile implicitly includes compensation for ancillaries, call coverage, etc. … How can you start out at the 90th %tile for the base when you intend to pay retention and incentive compensation?"

166.    With regard to the fair market value ceiling of the 90th percentile for base, incentive, and retention compensation, LarsonAllen explained:

> They should be limited to the 90th %tile of compensation per WRVU.  That was a premise I started with in our first [conversation] … after a preliminary review of the Plan.  I will not support a plan that provides compensation above the 90th %tile WRVU conversion factor, and only then if there are stretches to get there… You need caps on this plan and they need to be reasonable.

38

167.    LarsonAllen sent CHN a draft of its final opinion on August 8, 2008.  The opinion states that the purpose of the engagement was, among other things, to determine whether the proposed compensation was "within the range of fair market value" and to assist the parties "in complying with Section 4958 of the Internal Revenue Service code [and] … the Stark Law…."[6]

168.    The opinion contained a section, "Significant Assumptions," which included (1) imposing a fair market value ceiling of the 75th percentile for base compensation and (2) imposing a fair market value ceiling of the 90th percentile for base, incentive, and retention compensation.  LarsonAllen also assumed that any compensation "in excess of the 90th percentile will revert back to the employer and not be available to fund any other… physician compensation."

169.    Yeleti questioned the caps in an email to Javorka:  "For the FMV, they [LarsonAllen] have two cut off points.  One is that the … base compensation … shall not exceed 75th percentile… Then the absolute limit on compensation will be cut off at the 90th percentile… [I] wonder [why] the need for these arbitrary cut offs."

170.    Javorka shared Yeleti's objections to the caps with Malasto, who replied:  "Some of the aspects of the [compensation] plan that Ram [Yeleti] is struggling with are non-negotiable from a Section 4958 perspective.  The Network does not want to be the test case with the IRS on this one."

171.    Javorka then responded:  "I am a little frustrated in his [Yeleti's] pursuit of the 90th percentile."

---

[6]    "Section 4958" refers to Internal Revenue Code Section 4958, which imposes excise taxes on "excess benefit transactions" between a non-profit organization and a high-level person within the organization.

39

172.    On August 11, 2008, CHN's Compensation Committee met with LarsonAllen to review and discuss the draft final opinion.  The Compensation Committee did not approve the compensation plan.

173.    According to an August 11, 2008 email from Butler to Malasto, Yeleti, and Javorka, the CHN Compensation Committee "decided to defer approval of the Compensation Plan… After evaluating the LarsonAllen FMV Review Opinion, the Network Compensation Committee decided … [to] require a second third party review of the Compensation Plan."

174.    The CHN Compensation Committee then engaged Sullivan Cotter to review the LarsonAllen opinion and the compensation plan.

175.    On August 21, 2008, Sullivan Cotter provided a draft analysis of the LarsonAllen opinion to CHN.  In its analysis, Sullivan Cotter noted:

> The LA report indicates that the proposed compensation program is designed to pay the physicians at a rate equal to the 75th percentile of the market.  **Note that we do not believe that a ratio of total cash compensation (TCC) to clinical productivity (e.g., TCC per work RVU) that exceeds the 60th percentile of the market is consistent with fair market value standards.**  We routinely advise our clients that ratios above the 60th percentile of the market must be supported by additional business judgment factors … The report seems to suggest that a pay rate per work RVU up to the 90th percentile of the market is acceptable.  **This is well beyond any professional standard that SullivanCotter would use for this type of assessment.**  (emphasis in original)

176.    On September 5, 2008, the CHN Compensation Committee met to discuss the compensation plan.  According to notes from Malasto, Yeleti, and Jill Parris, CHN's Vice

President of Human Resources, at that meeting, the Compensation Committee gave "their overall full support" and decided that the integration was a "must do."  According to the notes, at that meeting, "The Compensation Committee [gave] … overall conditional approval of the compensation plan … with the full unconditional approval to come once the official documents [were] … received from Sullivan Cotter."

177.    The CHN Compensation Committee decided to approve the compensation plan even before it received Sullivan Cotter's fair market value analysis.

178.    On September 17, 2008, Sullivan Cotter sent its evaluation of the proposed compensation plan to CHN.

179.    The September 17, 2008 Sullivan Cotter letter specifically cites to the Stark Law, and states that "[t]o comply with relevant laws and regulations, CHN must demonstrate that the compensation terms specified in the proposed agreement are reasonable and consistent with the fair market value…."  The letter states further that one of the requirements of the Stark Law employment exception is that "[t]he compensation … must be consistent with fair market value, and may not be determined in a manner that takes into account the volume or value of any referrals…."

180.    The September 17, 2008 letter states (in bold):  "**Compensation levels supported by TCC to wRVU ratios [*i.e.*, clinical productivity ratios] up to the 60th percentile of the market are generally considered to be within competitive norms, reasonable, and consistent with fair market value for services provided**."

181.    According to the September 17, 2008 letter, Sullivan Cotter concluded that for 27 of the 34 cardiovascular specialists, the TCC exceeded the 75th percentile of the market data and

41

that for 22 of the 34 cardiovascular specialists, the TCC exceeded *even the 90th percentile* of the market data.

182.    Sullivan Cotter also concluded that for 29 of the 34 cardiovascular specialists, the TCC per wRVUs exceeded the 60th percentile of the market data and that for 23 of the 34 cardiovascular specialists, the TCC per wRVUs exceeded *even the 75th percentile* of the market data.

183.    As Sullivan Cotter found that the compensation for at least 27 of the 34 cardiovascular specialists exceeded fair market value under Sullivan Cotter's traditional analysis (*i.e.*, physicians whose TCC > 75th percentile and TCC per wRVU > 60th percentile), Sullivan Cotter offered additional – more lenient – criteria that might be used to justify the compensation plan.

184.    Sullivan Cotter noted, however, that these additional criteria were "outside of the generally accepted standards" and were to be applied only "on an exception basis."

185.    According to Sullivan Cotter, compensation that exceeded fair market value under the traditional analysis could be supported where there was supporting documentation of the "business judgment factors" and the following two conditions exist:

- "TCC exceeds the 75th percentile of the market, and clinical cash compensation to productivity ratios are between the 60th percentile and the 75th percentile of the market, particularly if based on wRVUS, **and** non-clinical hourly pay rates … do not exceed the 75th percentile of the market.

- Total compensation exceeds the 75th percentile of the market due to benefit levels that are between the 50th percentile and the 75th percentile." (emphasis in original)

186.    According to Sullivan Cotter, "business judgment factors" were factors such as:

- The strategic importance of the clinical program or service line;

- The community need for the services;

- The quality levels and/or clinical outcomes achieved;

- The financial performance of the clinical program or service line;

- Recruitment or retention difficulties in the clinical specialty;

- Individual accomplishments, including publications and awards;

- Leadership and business development skills;

- Grant dollars received or expected;

- Name recognition achieved by the physician;

- Individual training, clinical skills, and reputation;

- Historical compensation;

- Written offer letters from competing organizations;

- Temporary compensation during a time of physician shortages; and

- Exceptional work effort.

187. According to the September 17, 2008 letter, Sullivan Cotter concluded that the compensation for at least 23 of the 34 cardiovascular specialists did not satisfy the additional more lenient criteria.

188. Sullivan Cotter did not analyze business judgment factors for the cardiovascular specialists.

189. Sullivan Cotter could not justify the compensation for the majority of the cardiovascular specialists even using the additional more lenient criteria that it had characterized as "outside of the generally accepted standards" and stated were to be applied only "on an

exception basis and with supporting documentation of the business judgment factors considered in the evaluation process."

190.    Sullivan Cotter concluded (in bold) that "**Our analysis indicates that the projected TCC levels for the majority of the cardiologists and for all of the cardiovascular surgeons do not meet the criteria previously discussed as measure of reasonableness and FMV**."

191.    Sullivan Cotter did not conclude that CHN's proposed compensation for the 34 cardiovascular specialists was fair market value or reasonable.

192.    In an email dated October 28, 2008, CHN's Jill Parris referred to Sullivan Cotter's conclusions as finding that the compensation for the cardiovascular specialists was "out of bounds."

193.    The Compensation Committee approved the proposed compensation, even though CHN had not received a favorable FMV opinion from a valuation expert.

194.    On February 25, 2009, after the Board had approved the integrations of the breast care surgeons, cardiovascular specialists, and neurosurgeons, Board member Russell Swan wrote an email describing concerns the Board had expressed to Mills regarding CHN's recent integrations (*i.e.*, of the breast care surgeons, cardiovascular specialists, and neurosurgeons):

> I personally noted a concern that we have had three integration proposals, all of which exceeded the 75th percentile in pay.  I asked if we were likely to see an integration proposal that was 50th-75th percentile ranking on compensation. Brian [Bryan Mills] assured us wwe [sic] would.  I do think, as a compensation committee, we need to be comfortable with our rationale in justifying

44

compensation proposals.  To-date [sic] exceeding the recommendation limits has

been the rule, not the exception.

195.    During his May 8, 2018 testimony, Swan testified that "there was quite a bit of

pushback relative to each one of these" integrations from the Board because of concern that the

salaries were excessive.  That pushback, however, did not prompt CHN to reduce the proposed

compensation.

196.    On November 8, 2009, almost one year into the integration, Yeleti sent an email to

the vascular surgeons in anticipation of a meeting to discuss physician compensation:

"[r]emember, as we look at any of this, that all of you will make more than $800,000 this year.

That does NOT include the $100,000 per doc for the surgery center shares.  That does NOT

include the estimated $110,000 per doc for the retention and incentive bonus.  All combined

every one of you will be at or above a million in comp for the year under the current comp

model.  To be fair, compare those numbers not to each other, but to your colleagues elsewhere in

town or the nation."  Malasto and Javorka were copied on the email.

197.    Yeleti, Malasto, Javorka, and the physicians knew that their compensation

exceeded fair market value.

198.    In 2012, CHN decided it would begin to conduct an annual review of each

physician's compensation to determine whether the compensation was fair market value and

reasonable.  The review would be presented to the Compensation Committee the second quarter

of every year based on the prior 12 months of data.

199.    For purposes of reviewing the physician compensation, CHN established its own

internal FMV guidelines.  Under the guidelines, CHN would analyze whether each physician's

TCC was less than the 75th percentile of market data and whether the physician's TCC per

wRVU was less than 75th percentile of market data.  Compensation that was less than either of those benchmarks was deemed reasonable.  For compensation that exceeded both of those benchmarks, CHN would attempt to document "business judgment factors" to support the excessive compensation.

200.    CHN set the TCC per wRVU benchmark at the 75th percentile, even though Sullivan Cotter typically set the TCC per wRVU at the 60th percentile in its evaluations of physician compensation for CHN.

201.    The guidelines also imposed a cap on physician compensation.  The cap was set at the greater of TCC at the 90th percentile of market data or TCC per wRVU at the 90th percentile of market data.

202.    In October of 2012, CHN shared a draft of its guidelines with Sullivan Cotter and asked for feedback.  In response, Sullivan Cotter recommended that CHN "use the 60th percentile [benchmark] for TCC/wRVU … [because] [a]t the 75th percentile, studies and research have shown that there can be considerable disconnect between compensation levels and clinical production (a ratio of closer to the 50th percentile is the most preferred)."  Sullivan Cotter's recommendation to use the 60th percentile benchmark for TCC per wRVU was consistent with Sullivan Cotter's August 21, 2008 and September 17, 2008 letters to CHN regarding the cardiovascular specialists' compensation, as well as numerous other evaluations of physician compensation that Sullivan Cotter had performed for CHN, including evaluations of the compensation CHN paid to its orthopedic surgeons, breast surgeons, obstetrician gynecologists, reproductive endocrinologists, and sleep disorder physicians.

203.    Sullivan Cotter also recommended reducing the cap to the 75th percentile of TCC per wRVU and wrote:  "I would not recommend caps set at the 90th percentile of productivity

46

ratios – this would enable significant disconnects between productivity and TCC and paying at the upper-end of the market."

204.    When Yeleti saw the changes that Sullivan Cotter was recommending, he became "concerned" because they were "inconsistent with" the current cardiovascular specialists' compensation plan, which capped compensation at the "90th percentile TCC per wRVU."  Yeleti wrote to Javorka:  "[w]e can't take this [*i.e.*, Sullivan Cotter's recommended changes to the guidelines] to the comp committee at this time if there is this much discrepancy."

205.    CHN rejected Sullivan Cotter's recommendations and kept the guideline at the 75th percentile of TCC per wRVU and the cap at the 90th percentile of TCC per wRVU.

206.     In 2013, CHN engaged the firm Katz, Sapper & Miller (KSM) to conduct a "Physician Benchmarking Analysis," which was a review of physician compensation to determine whether compensation was fair market value and reasonable.

207.    KSM reviewed CHN physician compensation paid in 2012 and paid through June of 2013 and annualized for the remainder of that year.

208.    KSM reviewed compensation paid by CHN to the cardiovascular specialists (including the general cardiologists, electrophysiologists, interventional cardiologists, invasive cardiologists, and vascular surgeons), as well as the gastroenterologists, orthopedic surgeons, and obstetrician-gynecologists, and primary care physicians.

209.    KSM analyzed, among other things, the physician compensation (TCC) and the physician compensation relative to productivity (TCC per wRVUs).

210.    KSM removed "low produc[ing]" physicians from its analysis.

211.    Using the average physician compensation, wRVUs, and collections by specialty, KSM conclusions included the following:

General Cardiologists

- TCC exceeded the 90th percentile of market data

- TCC per wRVU exceeded the 90th percentile of market data

Electrophysiologists

- TCC exceeded the 75th percentile of market data

- TCC per wRVU exceeded the 90th percentile of market data

Interventional Cardiologists

- TCC exceeded the 90th percentile of market data

- TCC per wRVU exceeded the 90th percentile of market data

Invasive Cardiologists

- TCC exceeded the 90th percentile of market data

- TCC per wRVU exceeded the 90th percentile of market data

Vascular Surgeons

- TCC exceeded the 90th percentile of market data

- TCC per wRVU exceeded the 90th percentile of market data

212.    Among KSM's "Benchmarking Key Findings" were that compensation was "high compared to productivity in all specialties and primary care" and that CHN was "paying the physicians more per wRVU than what is being collected."

213.    When KSM transmitted its findings to CHN, KSM wrote to Javorka and others that KSM "[w]ould like to sit down with some of the internal folks [at CHN] and review the data to make sure we are using the right info because the numbers are staggering."

214.    When Javorka transmitted KSM's findings to Yeleti, he wrote:  "[t]hey [KSM] want to review before making it prime time but you can see … the information is astounding."

215.    Upon receiving KSM's findings from Javorka, Yeleti responded:  "Staggering."

216.    On August 11, 2014, CHN Board held a meeting of the Compensation Committee.
Attendees included Mills, Yeleti, and Javorka, Board members Jim Morey and Russ Swan, and
Jim Rohan of Sullivan Cotter (by phone).  Based on input from Sullivan Cotter, the
Compensation Committee decided to revise its internal guidelines as follows:  "… if
compensation exceeds the 75th percentile in [TCC] … or the [TCC/wRVU] exceeds the 60th
percentile … [w]e would need to present a business justification which would need approval
from the Compensation Committee.  Additionally, all compensation would be capped at the 90th
percentile of [TCC] or the 75th percentile of TCC/wRVU."

217.    During the meeting Rohan explained to the Compensation Committee the
rationale for setting the guideline of TCC per wRVU at the 60th percentile:  "OIG looks at the
delta above P60, they will scrutinize that as kick-backs for paying referrals."

218.    Morey stated "we [CHN] are too far down the road to stop, but we need to review
the delta to determine comfort level of the outcomes."

219.    According to the meeting minutes, Rohan "reminded the group that the Tuomey
case was lost and paid a huge settlement."

220.    "Tuomey" was a reference to *United States ex rel. Drakeford v. Tuomey*
*Healthcare System, Inc.*, Case No. 3:05-cv-02858 (MBS) (D.S.C.), *aff'd*, 792 F.3d 364 (4th Cir.
2015), where the United States obtained a judgment against a hospital that had compensation
arrangements with physicians that failed to satisfy any exception to the Stark Law, including
because the compensation exceeded fair market value.

49

221.   By virtue of their employment agreements, CHN and the cardiovascular specialists had compensation arrangements under the Stark Law.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

222.   During the term of these agreements, the cardiovascular specialists made DHS referrals to CHN, including referrals for inpatient and outpatient hospital services, for which CHN submitted claims to and received payments from Medicare.

223.   CHN's compensation arrangements with the cardiovascular specialists did not qualify for an applicable exception to the Stark Law because the compensation paid by CHN to the cardiovascular specialists exceeded fair market value.  *See* 42 U.S.C. § 1395nn(e)(2)(B)(i); *see also* 42 C.F.R. § 411.357(c)(2)(i).

224.   Examples of cardiovascular specialists and years during which they received compensation from CHN that exceeded fair market value include (but are not limited to) the following:

- Ansari:  2009 through 2014, and 2016

- Gamache:  2009 through 2013, and 2015 through 2017

- Guttikonda:  2009, 2010, 2012, and 2016

- Hahn:  2009, 2011, 2013, and 2014

- Hansen:  2009, 2012, 2013, and 2015 through 2017

- Hazlett:  2009 through 2013

- Jacob:  2009, 2013, 2015, and 2016

- Jetty:  2010, 2011, 2013, 2015, and 2017

- Jones:  2009 through 2011, and 2014 through 2016

- Kareti:  2009, 2010, 2014, 2016, and 2017

- Komari:  2011 through 2013, and 2015

- Lim:  2009 through 2017

- Mahenthiran:  2011 through 2017

- Meldahl:  2011 through 2017

- Morrison:  2009 through 2011, and 2013 through 2016

- Oscherwitz:  2009 through 2015

- Paul:  2009 through 2011, and 2013 through 2016

- Robertson:  2009 through 2012, and 2015 through 2017

- Sams:  2012, 2013, 2016, and 2017

- Shoemaker:  2010 through 2015

- Singh:  2009, 2012, 2013, and 2015 through 2017

- Venturini:  2009 through 2013

- Weinberger:  2009 through 2013, 2016 and 2017

- Yeleti:  2009 and 2014

- Ziperman:  2009 through 2013, and 2016

225.    CHN's submission of claims to Medicare for DHS that were referred by the cardiovascular specialists therefore violated the Stark Law.

226.    Examples of claims that CHN submitted to Medicare for DHS that were referred by the cardiovascular specialists in violation of the Stark Law can be found on Exhibit 3.

**III.    CHN's Employment of the Neurosurgeons**

227.    Beginning in 2006, CHN sought to expand its neurosurgery service line by recruiting and directly employing neurosurgeons from the Indianapolis market.

228.    Between 2008 and 2010, CHN recruited and employed four neurosurgeons:  Jill Donaldson, Robert Sloan, John Cummings, and David Hall.  Donaldson, Sloan, and Cummings practiced at CHN when they were recruited for employment there.

229.    In December of 2007, CHN entered into an Agreement for Physician Services with Donaldson.  The term of the Agreement ran for two years, from March 17, 2008 to March 16, 2010.

230.    Under the Agreement, CHN agreed to pay Donaldson an annual guaranteed base salary of $650,000 for the first year and $675,000 for the second year.  She was also paid half of CHN's collections attributable to her professional services to the extent that they exceeded her salary and overhead costs.

231.    In June of 2008, CHN entered into an Agreement for Physician Services with Sloan.  The term of the Agreement ran for five years, from to June 30, 2008 to June 29, 2013.

232.    Under the Agreement, CHN agreed to pay Sloan an annual guaranteed base salary of $900,000 (*i.e.*, 11,719 wRVUs @ $76.80/wRVU) plus any amount by which collections for his professional services exceeded his salary and overhead costs.  If during the term of the Agreement Sloan failed to meet certain production goals, his guaranteed base salary would be reduced to $850,000 the following year.

233.    In 2009, CHN targeted several additional neurosurgeons for employment, including Cummings and Hall.

234.    In December of 2009, CHN entered into an Agreement for Physician Services with Cummings.  The term of the Agreement ran for five years, from January 1, 2010 to December 31, 2014.

235.    Under the Agreement, CHN agreed to pay Cummings a salary that was wRVU-based and included base, retention, and incentive components.

236.    The Agreement projected that Cummings's total compensation rate would be $90.42/wRVU and that he would perform 14,384 wRVUs.  Based on those figures, the Agreement projected he would earn total compensation of $1,300,536.

237.    The Agreement notes that Cummings' compensation rate, $90.42/wRVU, exceeded the 75th percentile of TCC/wRVU, which the agreement states was $82.50/wRVU.

238.    In January of 2010, CHN entered into an Agreement for Physician Services with Hall.  The term of the Agreement ran for five years, from February 1, 2010 to January 31, 2015.

239.    Under the Agreement, CHN agreed to pay Hall a salary that was wRVU-based and included base, retention, and incentive components.

240.    The Agreement guaranteed Hall a minimum base salary of $921,600 (based on 12,000 wRVUs @ $76.80/wRVU) for the first three years of the term of the Agreement.

241.    The Agreement projected that Hall's total compensation rate would be $90.33 – $90.40/wRVU and that he would perform 12,000 – 17,000 wRVUs.  Based on those figures, the Agreement projected he would earn total compensation of $1,084,000 - $1,536,000.

242.    In advance of hiring Cummings and Hall, CHN retained Sullivan Cotter to analyze a five year compensation plan for Sloan, Donaldson, Cummings, and Hall.

243.    On December 8, 2009, Jane Callahan provided CHN's compensation plan for the four neurosurgeons to Sullivan Cotter for a fair market value and reasonableness evaluation.  As described in greater detail *infra*, Callahan knowingly provided to Sullivan Cotter compensation figures for Donaldson and Sloan that were falsely deflated and did not disclose that CHN was guaranteeing compensation to Donaldson, Hall, and Sloan.

244.    Later that day, Sullivan Cotter completed its evaluation and sent its "Summary of Fair Market Value and Reasonableness Evaluation for Neurosurgery Compensation Plan" to CHN.  The Summary set forth the conclusions of Sullivan Cotter's "analysis of whether the proposed compensation represents FMV as defined under provisions of the Stark Laws."

245.    As it did with other compensation analyses performed for CHN, Sullivan Cotter evaluated the physicians' compensation relative to market salary data under two criteria:  TCC and TCC/wRVU.

246.    As it did with other compensation analyses performed for CHN, Sullivan Cotter first evaluated whether the TCC paid to the physicians was less than the 75th percentile of the national market data.  If TCC exceeded the 75th percentile of the market data, then Sullivan Cotter would perform a second step and evaluate whether the TCC could be supported by productivity.  For this second step, Sullivan Cotter would evaluate the TCC per wRVUs.

247.    Rather than use the 60th percentile as the threshold below which the TCC per wRVU would be considered fair market value and reasonable, as it did in its other fair market value evaluations for CHN, Sullivan Cotter used the 75th percentile of market data – a more lenient standard.

248.    In her May 9, 2018 testimony, Stolis of Sullivan Cotter, who co-authored the Summary, testified that using the 75th percentile as the threshold below which the TCC per wRVU would be considered fair market value was "reserved for very rare circumstances in clinical specialties that were highly specialized or where there was a significant and well-documented national shortage" of physicians in that specialty.

249.    For purposes of its analysis, Sullivan Cotter assumed that each physician would earn 50 percent of the incentive compensation for which he/she was eligible.

250.    Sullivan Cotter evaluated the proposed compensation for each of the four neurosurgeons as well as the aggregated compensation for the group for the subsequent five years.

251.    Sullivan Cotter concluded the following regarding the proposed compensation plan:

Hall

- TCC exceeded the 95th percentile for all five years

- TCC per wRVU exceeded the 75th percentile for all five years

Cummings

- TCC exceeded the 95th percentile for all five years

- TCC per wRVU exceeded the 75th percentile for all five years

Sloan

- TCC exceeded the 75th percentile in years 3-5

- TCC per wRVU exceeded the 75th percentile in years 3-5

Donaldson

- TCC fell below the 75th percentile for all five years

- TCC per wRVU fell below the 75th percentile for all five years

Aggregated Group

- TCC exceeded the 75th percentile for all five years

- TCC per wRVU exceeded the 75th percentile for all five years

252.    Sullivan Cotter noted that if regional rather than national salary market data was used, the TCC per wRVU would drop below the 75th percentile in certain instances, but Sullivan Cotter expressly "caution[ed] against using [regional] … data" because the regional data was

"limited to only one survey source[,]" and "given sample size concerns … [regional] data may potentially be skewed towards a handful of organizations in states other than Indiana."

253.   Sullivan Cotter did not conclude that the compensation plan for the neurosurgeons was within fair market value or reasonable.

254.   CHN knowingly provided false compensation figures to Sullivan Cotter.

255.   Even though CHN was paying Donaldson a guaranteed base salary of $650,000 for the first year and $675,000 for the second year of the term of the agreement that CHN had entered into with Donaldson in December of 2007, CHN indicated to Sullivan Cotter that Donaldson's salary for the first two years under the compensation plan was $420,320 and $463,052, respectively.

256.   Even though CHN was paying Sloan a guaranteed base salary of $900,000 for five years pursuant to the agreement that CHN had entered into with Sloan in June of 2008, CHN indicated to Sullivan Cotter that Sloan's salary for the first two years under the compensation plan was $583,924 and $642,716, respectively.

257.   CHN also did not disclose to Sullivan Cotter that it was guaranteeing minimum base salaries to Sloan and Donaldson, or that it would guarantee a minimum base salary to Hall.

258.   On May 9, 2018, Sullivan Cotter's Stolis testified that "If [salaries] were guaranteed, yes, I would have expected that Community Health Network would have disclosed that [to us]."

259.   Stolis also testified that salary guarantees are appropriate where (1) the physician is "recently out of school," (2) "relocating or … need ramp-up time," (3) the physician has a non-competition agreement in place, and/or (4) the physician is being recruited to a "not so desirable location," which, according to Stolis, is not Indianapolis.

260.     On or about December 14, 2009, CHN's Compensation Committee approved the five year compensation plan for Sloan, Donaldson, Hall, and Cummings that had been evaluated by Sullivan Cotter.

261.     In June of 2010, a few months after Cummings and Hall were hired, CHN revised Donaldson's compensation.

262.     Under the new agreement, which became effective on June 1, 2010 and ran through May 31, 2013, CHN would pay Donaldson a salary that was wRVU-based and included base and incentive components.

263.     Under the new agreement, CHN would pay Donaldson base compensation of $76.80/wRVU.

264.     Under the new agreement, CHN guaranteed Donaldson a minimum base annual salary of $675,000 (*i.e.*, 8789 wRVUs @ $76.80/wRVU) for the first year and $600,000 (*i.e.*, 7813 wRVUs @ $76.80/wRVU) for the second and third years.

265.     The projected wRVUs that CHN provided to Sullivan Cotter exceeded the wRVUs actually produced by the neurosurgeons.

266.     For 2010, Cummings performed 13,063 wRVUs compared to 14,384 wRVUs that CHN projected to Sullivan Cotter that he would perform.

267.     For 2010, Donaldson performed 4596 wRVUs compared to 6830 wRVUs that CHN projected to Sullivan Cotter that she would perform and compared to 8789 wRVUs upon which her guaranteed base salary was based.

268.     For 2010, Hall performed 7971 wRVUs compared to 12,000 wRVUs that CHN had projected to Sullivan Cotter that he would performed and upon which his guaranteed base salary was based.

269.    For 2010, all four neurosurgeons collectively earned 38,324 wRVUs compared to 42,695 wRVUs that CHN had projected to Sullivan Cotter that the neurosurgeons would earn in the aggregate.

270.    Because of the salary guarantees for Donaldson, Hall, and Sloan, the TCC per wRVU rates actually paid by CHN turned out to be higher than those presented to and evaluated by Sullivan Cotter.

271.    In its Summary, Sullivan Cotter estimated the 75th and 90th percentiles of national market data of TCC per wRVU to be $81.83 and $104.47, respectively, over the five years of the compensation plan.  These estimates were based on an assumption of constant growth for both compensation and wRVUs over the five year term of the compensation plan.

272.    Based on her guaranteed base salary of $675,000 (excluding any incentive compensation) and actual wRVUs of 4596 in 2010, Donaldson's TCC per wRVU was $146.87, well above Sullivan Cotter's estimate of the 75th and even the 90th percentile of national market data.

273.    Based on his guaranteed base salary of $921,600 (excluding any incentive and retention compensation) and actual wRVUs of 7971 in 2010, Hall's TCC per wRVU was $115.62, well above Sullivan Cotter's estimate of the 75th and even the 90th percentile of national market data.

274.    Based on his guaranteed base salary of $900,000 (excluding any incentive compensation) and actual wRVUs of 9891 in 2010, Sloan's TCC per wRVU was $90.99, well above Sullivan Cotter's estimate of the 75th percentile of national market data.

275.    Based on his guaranteed base salary of $921,600 (excluding any incentive and retention compensation) and actual wRVUs of 10,488 in 2011, Hall's TCC per wRVU was $87.88, well above Sullivan Cotter's estimate of the 75th percentile of national market data.

276.    Based on his guaranteed base salary of $921,600 (excluding any incentive and retention compensation) and actual wRVUs of 9707 in 2012, Hall's TCC per wRVU was $94.94, well above Sullivan Cotter's estimate of the 75th percentile of national market data.

277.    Based on his guaranteed base salary of $900,000 (excluding any incentive compensation) and actual wRVUs of 9244 in 2012, Sloan's TCC per wRVU was $97.36, well above Sullivan Cotter's estimate of the 75th percentile of national market data.

278.    In August of 2011, CHN began considering hiring James Callahan, a neurosurgeon practicing in the Indianapolis area.

279.    CHN believed that by hiring James Callahan it could capture "at least 1/3 of the volume" of "neuro and spine cases" in Madison, Grant, Tipton, and Delaware counties.

280.    In January of 2012, CHN entered into an Agreement for Physician Services with James Callahan.  The term of the Agreement ran for four years, from February 1, 2013 to January 31, 2017.

281.    Under the Agreement, CHN agreed to pay James Callahan a salary that was wRVU-based and included base, retention, and incentive components.

282.    The Agreement guaranteed James Callahan a minimum base salary of $921,600 (based on 12,000 wRVUs @ $76.80/wRVU) for the first three years of the term of the Agreement.

283.    On February 6, 2012, two weeks after CHN agreed to pay James Callahan a guaranteed minimum base salary of $921,600, Holly Millard, CHN's Chief Accounting Officer

wrote to Jane Callahan:  "I am assuming someone is making sure that the salary is in accordance with MGMA guidelines and is being approved by some sort of committee given the high dollar amount … [W]ith this high of salary, he would likely make the top five list for disclosure on a 990 tax form so you would want to make sure senior management realizes that and is comfortable answering questions about a salary level at this rate.  The 990 is a public document that the public has access to as well as other employed physicians within the Network."

284.    Callahan's salary was not "in accordance with MGMA guidelines" or reviewed or "approved by" CHN's Compensation Committee.

285.    In March of 2012, CHN realized that Callahan would not be as busy or productive as anticipated.

286.    Although CHN had guaranteed his $921,600 salary based on 12,000 wRVUs, in March of 2012, CHN revised downward significantly Callahan's projected wRVUs to 7983.

287.    By virtue of their employment agreements, CHN and the neurosurgeons had compensation arrangements under the Stark Law.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

288.    During the term of these agreements, the neurosurgeons made DHS referrals to CHN, including referrals for inpatient and outpatient hospital services, for which CHN submitted claims to and received payments from Medicare.

289.    CHN's compensation arrangements with the neurosurgeons did not qualify for an applicable exception to the Stark Law because the compensation paid by CHN to the neurosurgeons exceeded fair market value.  *See* 42 U.S.C. § 1395nn(e)(2)(B)(i); *see also* 42 C.F.R. § 411.357(c)(2)(i).

290.    Examples of years during which the compensation paid by CHN to the neurosurgeons exceeded fair market value include (but are not limited to) the following:

- Cummings:  2011 and 2012

- Donaldson:  2009 through 2012

- Hall:  2010 through 2014

- Sloan:  2009 through 2013

291.    CHN's submission of claims to Medicare for DHS that were referred by the neurosurgeons therefore violated the Stark Law.

292.    Examples of claims that CHN submitted to Medicare for DHS that were referred by the neurosurgeons in violation of the Stark Law can be found on Exhibit 4.

## IV.    CHN'S Payment of Incentive Compensation

293.    CHN's physician compensation plan often included three components:  base, retention, and incentive compensation.

294.    The incentive component of the compensation in turn included three components:  physician-driven metrics, network financial performance (or network margin), and service line financial performance.

295.    The physician-driven component made up 50 percent of the total incentive compensation for which the physician was potentially eligible, while the network margin and service line financial performance compensation components each made up 25 percent of the total incentive compensation for which the physician was potentially eligible.

296.    CHN conditioned awarding the service line financial performance portion of the incentive compensation on, among other things, meeting targeted revenues generated by referrals from the physician to the hospital.

61

297.    As set forth on a documented titled, "Community East and North General Surgery Integration," the service line financial performance portion of the incentive compensation was conditioned on the physician meeting "Financial and Operational Targets," which meant that the physician had to "meet or exceed individual budgeted cases for ISC [surgery center] and hospital."

298.    A May 8, 2012 email from Debbie Bopp to Javorka explains that payment of the service line financial performance portion of the incentive compensation was conditioned upon, among other things, "hospital downstream revenue specific to the physician."

299.    By way of example, for 2010, CHN conditioned paying the service line financial performance portion of incentive compensation on meeting a target of referral revenues to the CHN and its subsidiaries and affiliates, and paid that portion of incentive compensation for the following physicians:

- Cummings – bonus paid $64,310

- Jansen – bonus paid $8990

- Rosie Jones – bonus paid $9171

- Pavlik – bonus paid $8464

300.    By virtue of their employment agreements, CHN and its physicians had compensation arrangements under the Stark Law.  *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

301.    During the term of these agreements, the physicians made DHS referrals to CHN and its subsidiaries and affiliates, including referrals for inpatient and outpatient hospital services, for which CHN and its subsidiaries and affiliates submitted claims to and received payments from Medicare.

302.    CHN's compensation arrangements with its physicians, such as the ones listed above, included incentive compensation that CHN conditioned upon the physician meeting a target of revenues from his or her referrals to CHN and its subsidiaries and affiliates.

303.    By conditioning incentive compensation on the physicians meeting a target of revenues from their referrals to CHN and its subsidiaries and affiliates, CHN determined the physicians' compensation in a manner that took into account the volume or value of their referrals.

304.    These compensation arrangements did not qualify for an applicable exception to the Stark Law because the compensation paid by CHN took into account the volume or value of referrals to CHN and its subsidiaries and affiliates.  *See* 42 U.S.C. § 1395nn(e)(2)(B)(ii); *see also* 42 C.F.R. § 411.357(c)(2)(ii).

305.    The claims submitted to Medicare by CHN and its subsidiaries and affiliates for DHS that were referred by the physicians who received such incentive compensation therefore violated the Stark Law.

306.    Examples of claims that CHN submitted to Medicare for DHS that were referred by such physicians in violation of the Stark Law can be found on Exhibit 5.

**V.    CHN's False Claims and Statements**

307.    CHN submitted claims to Medicare for specific inpatient and outpatient hospital services provided to individual Medicare beneficiaries that were referred in violation of the Stark Law by the physicians with whom CHN had the compensation arrangements as described above.

308.    At all times relevant to this lawsuit, the Medicare statutory and regulatory rules described above, *see supra* ¶¶ 29-50, applied to CHN as an enrolled Medicare provider.

309.     Since September 30, 2011, Wisconsin Physicians Service Insurance Corporation served as the MAC to which CHN submitted Medicare enrollment forms, claims, and cost reports.  Prior to September 30, 2011, National Government Services served as the Medicare Part A intermediary and Part B carrier to which CHN submitted Medicare enrollment forms, claims, and cost reports.

310.     Throughout the relevant time period, CHN submitted Medicare enrollment applications, including on the applications listed on Exhibit 6, which sets forth the specific CHN entity that submitted the application as well as the date of submission and signatory.

311.     In those enrollment applications, CHN certified, among other things:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  *__I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law)__*, and on the provider's compliance with all applicable conditions of participation in Medicare (emphasis added).

312.     Throughout the relevant time period, CHN submitted annual Medicare cost reports as described above, including on the cost reports listed on Exhibit 7, which sets forth the specific CHN entity that submitted the cost report as well as the date of submission and signatory.

313.     In its cost reports, CHN certified:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a
> true, correct and complete statement prepared from the books and records
> of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding
> the provision of health care services, and that the services identified in this
> cost report were provided in compliance with such laws and regulations.

314.    CHN's cost-report certification pages also included the following notice:

> Misrepresentation or falsification of any information contained in this cost
> report may be punishable by criminal, civil and administrative action, fine
> and/or imprisonment under federal law.  Furthermore, if services identified
> by this report were provided or procured through the payment directly or
> indirectly of a kickback or where otherwise illegal, criminal, civil and
> administrative action, fines and/or imprisonment may result.

315.    CHN expressly and falsely certified compliance with the Stark Law in its annual cost reports, which, as explained above, constituted CHN's final claim for items and services provided to Medicare beneficiaries for that year.

316.    CHN also submitted thousands of Medicare claims for specific services unlawfully referred in violation of the Stark Law.

317.    In submitting such claims, CHN made specific representations about the billed services that were rendered materially misleading by CHN's knowing failure to disclose the claims' noncompliance with the Stark Law.

318.    The claims identified on Exhibits 2-5 are specific examples of claims for inpatient hospital services that were submitted by CHN that resulted from referrals by the physicians described above.

**VI.    Scienter**

319.    At all relevant times, as already set forth above, CHN acted knowingly – that is, with actual knowledge, in deliberate ignorance, or with reckless disregard – with respect to the fact that it was submitting false claims to Medicare as alleged here; that it was making false records or statements material to false claims or to get claims paid; and that it was making false records or statements material to an obligation to refund money to the United States, or knowingly concealing or avoiding such an obligation.

320.    At all relevant times, CHN was familiar with the requirements of the Stark Law, as evidenced by, among other things, their certifications in the Medicare enrollment applications and hospital cost reports described above.

321.    Specifically, and among other things, CHN was familiar with the Stark Law's prohibition on hospitals submitting, and Medicare paying, claims for DHS referred in violation of the statute, 42 U.S.C. §§ 1395nn(a)(1), (g)(1), and the statute's requirement that entities receiving prohibited reimbursements refund those amounts on a timely basis, 42 C.F.R. § 411.353(d).

322.    At all relevant times, CHN was familiar with the requirements under the applicable exceptions under the Stark Law that compensation be fair market value and not be determined in a manner that takes into account the volume or value of referrals.

323.    As discussed above, CHN retained valuation experts to determine whether the compensation CHN proposed to pay the breast surgeons, cardiovascular specialists, and neurosurgeons was fair market value *for purposes of compliance with the Stark Law*.

324.    The Sullivan Cotter opinions regarding the breast surgeons and neurosurgeons state that the purpose of Sullivan Cotter's analyses was to determine "whether the proposed compensation represents FMV as defined under the provisions of the Stark Law."

325.    Sullivan Cotter's September 17, 2008 analysis of the compensation that CHN proposed to pay the cardiovascular specialists is even more explicit, as it specifically cites to the Stark Law *and* states that "[t]o comply with relevant laws and regulations, CHN must demonstrate that the compensation terms specified in the proposed agreement are reasonable and consistent with the fair market value…."  The letter states further that under the Stark Law "[t]he compensation … must be consistent with fair market value, and may not be determined in a manner that takes into account the volume or value of any referrals…."

326.    Similarly, the LarsonAllen August 8, 2008 draft opinion for the cardiovascular specialists states that the purpose of the analysis was to determine whether the proposed compensation was "within the range of fair market value" and to assist the parties "in complying with … the Stark Law…."

327.    At all relevant times, CHN acted knowingly – that is, with actual knowledge, in deliberate ignorance, or with reckless disregard – with respect to the fact that the physician compensation arrangements described above did not satisfy the requirements of an applicable exception to the Stark Law because the compensation exceeded fair market value.

328.    With respect to the breast surgeons, Sullivan Cotter found that the TCC and TCC per wRVUs both exceeded fair market value.  Sullivan Cotter was only able to render a favorable

67

opinion for one year and only based on TCC per collections.  As described above, however, CHN knowingly provided falsely inflated collection figures to Sullivan Cotter so that it would render a favorable opinion.  In addition, CHN's management did not "provide an annual recap of [the TCC per collections] ratio for future compensation committee review in contract years 2-5," as directed by Board member Jim Morey when the Board approved the compensation.

329.    With respect to the cardiovascular specialists, Sullivan Cotter stated the proposed compensation for the majority of the cardiovascular specialists did not meet its standard criteria for fair market value.

330.    CHN knowingly provided Sullivan Cotter with falsely deflated compensation figures for the neurosurgeons, and even with the inaccurately low figures, Sullivan Cotter did not opine that the compensation was fair market value.

331.    In 2014, CHN retained KSM to evaluate whether the compensation CHN paid to its physicians in 2012 and through June of 2013 was fair market value, and KSM concluded that the compensation was "high compared to productivity in all specialties and primary care."

332.    At the August 11, 2014 Compensation Committee meeting, Sullivan Cotter explained to CHN that law enforcement would scrutinize compensation that exceeded the 60th percentile of TCC per wRVU as "kick-backs for paying referrals."  Board member Morey acknowledged that CHN was compensating physicians above that threshold but stated that CHN would not take any corrective action because "we are too far down the road to stop."

333.    On November 27, 2013, Karen Ann Lloyd, CHN's in house attorney, emailed an article to Javorka regarding the settlement in *United States ex rel. Baklid-Kunz v. Halifax Hosp. Medical Center and Halifax Staffing, Inc.*, Case No. 6:09-cv-1002-Orl-31TBS (M.D. Fla.).  The following passage from the article was highlighted in her email:

68

The first lesson of Halifax is that in negotiating and drafting physician employment arrangements, hospitals should be careful not to determine any part of the physicians' pay - whether directly or indirectly - on hospital facility fee revenue resulting from the physicians' referrals … employers need to pay attention to the *structure* of the compensation formula to ensure compliance with Stark. (emphasis in original)

334.    During testimony provided on August 18, 2017, Callahan was asked whether she "recall[ed] the Stark Law touching on physician salaries." She responded: "[y]eah. I believe that that's true. I mean we were concerned that the salaries we were … paying were within market value." She also testified that that was her understanding of the Stark Law as far back as 2008.

335.    On May 8, 2018, Swan, CHN's Board member and voting member of the Board's Compensation Committee since at least 2007, testified "my understanding of the Stark Law is basically … to make sure that the income salary that's being paid to a particular physician is fair market value and reasonable."

336.    During his May 8, 2018 testimony, when asked whether it was his understanding that "Under the Stark Law … hospitals [can] pay employed physicians based on downstream revenues that those employed physicians generate for the hospital," Swan answered: "No."

## VII.    Materiality

337.    As already set forth above, the fact that CHN's Medicare claims at issue were prohibited under the Stark Law was material to Medicare's decision whether to pay those claims.

338.    CHN's false representations in their Medicare enrollment forms and cost reports – certifying prospectively and retrospectively that their claims complied with the Stark Law – were material to Medicare's decision whether to pay CHN's claims; were intended to induce Medicare

to pay those claims; were material to CHN's obligation to refund improper reimbursements to the United States; and concealed and avoided that obligation.

339. As demonstrated by their familiarity with the Stark Law, and by their certifications of compliance therewith, CHN understood at all times relevant to this lawsuit the above-described materiality of compliance with the Stark Law and their certifications of compliance therewith.

340. The Stark Law expressly states that hospitals may not bill, and Medicare may not pay, claims for DHS referred in violation of the statute. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

341. Further, the accompanying regulations require the timely refund of any payments received in violation of the Stark Law. 42 C.F.R. § 411.353(d).

342. As noted above, on its provider enrollment form and elsewhere, CMS identifies compliance with the Stark Law as a condition of payment for Medicare claims.

343. Compliance with the Stark Law goes to the essence of Medicare's bargain with participating healthcare providers. The Stark Law plays a key role in ensuring that services are reasonable and necessary, and not provided merely to enrich the parties in a financial relationship at the expense of federal health programs and their beneficiaries.

344. For these reasons, the United States routinely pursues or settles cases, like this one, alleging that entities and individuals submitted or caused the submission of claims that were false because they violated the Stark Law.

345. For example, in *United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008), the United States obtained a judgment against a hospital executive who knowingly had caused the hospital to submit false claims resulting from referrals by physicians whose compensation arrangements with the hospital did not satisfy the

requirements of any applicable exception to the Stark Law, including because the compensation paid exceeded fair market value of the physicians' services.

346.     In *United States ex rel. Drakeford v. Tuomey Healthcare System, Inc.*, Case No. 3:05-cv-02858 (MBS) (D.S.C.), *aff'd*, 792 F.3d 364 (4th Cir. 2015), the United States obtained a judgment against a hospital that had compensation arrangements with physicians that failed to satisfy the requirements of any applicable exception to the Stark Law, including because the physicians' compensation exceeded the fair market value of their actual services.

347.     In September of 2015, the United States settled a case, *United States ex rel. Reilly v. North Broward Hospital District, et al.*, Case No. 10-60590 (S.D. Fla.), involving allegations that a hospital had entered into compensation arrangements with certain physicians that did not satisfy the requirements of any applicable exception to the Stark Law, including because the compensation paid exceeded fair market value.

348.     In September of 2015, the United States settled two cases, *United States ex rel. Payne, et al. v. Adventist Health System/Sunbelt, Inc., et al.*, No. 12-856 (W.D.N.C) and *United States ex rel. Dorsey v. Adventist Health System Sunbelt Healthcare Corp., et al.*, No. 13-217 (W.D.N.C), involving allegations that a hospital had entered into compensation arrangements with physicians that did not satisfy the requirements of any applicable exception to the Stark Law, including because the compensation paid was determined in a manner that took into account the volume or value of the physicians' referrals.

349.     In August of 2018, the United States settled four cases, *United States ex rel. David Felten, M.D., Ph.D. v. William Beaumont Hospitals, et al.*, No. 2:10-cv-13440 (E.D. Mich.), *United States ex rel. Karen Carbone v. William Beaumont Hospital*, No. 11-cv-12117 (E.D. Mich.), *United States ex rel. Cathryn Pawlusiak v. Beaumont Health System, et al.*, No. 2:11-cv-

12515 (E.D. Mich.), and *United States ex rel. Karen Houghton v. William Beaumont Hospital*, No. 2:11-cv-14312 (E.D. Mich.), involving allegations that a hospital had entered into compensation arrangements with certain physicians that did not satisfy the requirements of any applicable exception to the Stark Law, including because the compensation paid exceeded fair market value.

350.    The violations alleged here are not minor or insubstantial.  CHN violated the Stark Law in ways that implicate the core concerns of the statute, including because CHN paid physicians in excess of fair market value for their services or in a manner that took into account the volume or value of their referrals in order to secure their referrals.  CHN knowingly and systematically paid physicians compensation that was excessive or that took into account the volume or value of referrals that resulted in thousands of false Medicare claims.

## FIRST CAUSE OF ACTION

**False Claims Act:  Presenting and Causing False Claims**
(31 U.S.C. § 3729(a)(1) (claims up to and through May 19, 2009)
and 31 U.S.C. § 3729(a)(1)(A) (claims from and after May 20, 2009))

351.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth here.

352.    CHN presented and caused to be presented materially false and fraudulent claims for payment or approval to the United States, including claims to the Medicare program for reimbursement (specific examples of which are identified in Exhibits 2-5) of designated health services rendered to patients who were referred by employed physicians in violation of the Stark Law.

353.    CHN presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

354.    The United States sustained damages because of CHN's wrongful conduct.

## SECOND CAUSE OF ACTION

### False Claims Act:  False Statements Material to False Claims
(31 U.S.C. § 3729(a)(1)(B) (all claims))

355.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth here.

356.    CHN made, used, and caused to be made or used false records or statements – *i.e.*, the false certifications and representations made and caused to be made by CHN when submitting the false claims for payments and the false certifications made by CHN in submitting enrollment agreements and annual cost reports – to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

357.    CHN's false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of CHN's statements and actions.

358.    The false certifications and representations made and caused to be made by CHN were material to the United States' payment of the false claims.

359.    CHN made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

360.    The United States sustained damages because of CHN's wrongful conduct.

## THIRD CAUSE OF ACTION

**False Claims Act:  False Records Material to Obligation to Pay**
(31 U.S.C. § 3729(a)(7) (claims up to and through May 19, 2009)
and 31 U.S.C. § 3729(a)(1)(G) (claims from and after May 20, 2009))

361.     The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth here.

362.     CHN made and used or caused to be made or used false records or statements, including enrollment agreements and annual cost reports, material to an obligation to pay or transmit money to the United States, and knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

363.     CHN made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

364.     The United States sustained damages because of CHN's wrongful conduct.

## FOURTH CAUSE OF ACTION

**Payment by Mistake**

365.     The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth here.

366.     This is a claim for the recovery of monies paid by the United States to CHN (directly or indirectly) as a result of mistaken understandings of fact.

367.     The United States paid CHN for claims for designated health services referred in violation of the Stark Law by physicians who had compensation arrangements with CHN, without knowledge of material facts, and under the mistaken belief that CHN was entitled to receive payment for such claims, which were not eligible for payment.  The United States' mistaken belief was material to its decision to pay CHN for such ineligible claims.  Accordingly,

74

CHN is liable for damages to the United States for the total amount of the payments made in error to CHN by the United States.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

368.     The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth here.

369.     This is a claim for the recovery of monies by which CHN has been unjustly enriched at the expense of the United States.

370.     By directly or indirectly obtaining government funds to which it was not entitled, CHN was unjustly enriched, and is liable to account for and pay as restitution such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

The United States demands and prays that judgment be entered in its favor and against CHN as follows:

I.     On the First Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.     On the Second Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

III.     On the Third Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

IV.      On the Fourth Count for payment by mistake, for the damages sustained and/or amounts by which CHN was paid by mistake or by which CHN retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

V.       On the Fifth Count for unjust enrichment, for the damages sustained and/or amounts by which CHN was unjustly enriched or by which CHN retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

The United States demands a jury trial in this case.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

JOSH J. MINKLER
United States Attorney

Dated:  January 6, 2020

*/s/ Arthur S. Di Dio*
Andy J. Mao
Sara McLean
Arthur S. Di Dio
Kelly A. Quinn
Attorneys, Civil Division
U.S. Department of Justice
300 North Los Angeles Street
Federal Building, Room 7516-110
Los Angeles, CA 90012
(213) 894-2447
Arthur.Di.Dio@usdoj.gov

*/s/ Shelese Woods*
Shelese Woods
Justin Olson
Assistant United States Attorneys
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333
Shelese.Woods@usdoj.gov
Justin.Olson2@usdoj.gov

*Attorneys for the United States*

## <u>CERTIFICATE OF SERVICE</u>

On January 6, 2020, I caused a true and accurate copy of the foregoing United States'

Complaint in Intervention to be filed using the Court's CM/ECF system, which will send an

electronic notice of filing to all counsel of record.

/s/ *Shelese Woods*
Assistant United States Attorney

78