UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:14-cv-01215-RLY-MKK |
| | ) | |
| COMMUNITY HEALTH NETWORK, INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| THOMAS P. FISCHER, | ) | |
| | ) | |
| Relator. | ) | |

## ORDER

This matter comes before the Court on Relator Thomas Fischer's Motion to

Compel Production of Defendant Community Health Network's Litigation Hold

Notices and accompanying testimony, Dkt. [532]. The motion was referred to the

undersigned and, for the reasons that follow, is hereby **GRANTED IN PART** and

**DENIED IN PART**.

## I.    Background

### A.    Initiation of the Lawsuit

Relator filed a *qui tam* complaint on July 21, 2014, alleging that the

Defendants had violated the False Claims Act and the Indiana False Claims and

Whistleblower Protection Act. (Dkts. 1, 32). Before filing the complaint, Relator had

some limited communications with Defendant Community Health Network, Inc.

1

("CHN"). On March 26, 2014, Relator (through his counsel) sent a letter to CHN concerning what he characterized as his "wrongful discharge." (Dkt. 546-4 at 2). This letter put CHN on notice of potential litigation related to Relator's employment with CHN. (*Id.*). On May 2, 2014, Relator (again through his counsel) sent another letter to CHN regarding "Document Preservation Regarding Thomas Fischer." (Dkt. 532-3). In that letter, counsel requested that CHN preserve certain documents and information that were relevant to Relator's claim(s). (*Id.*). The May 2014 letter was both lengthy and detailed and included a list of approximately 176 individuals who Relator believed should be deemed custodians. (*Id.* at 6-10).

### B.     HHS-OIG Subpoena

On November 25, 2014, the Department of Health and Human Services Office of Inspector General ("OIG") served a subpoena on CHN. (Dkt. 532-16 at 4). The OIG subpoena sought production of documents relating to, among other things, physician acquisition, recruitment, and compensation.  (*Id.* at 18-19). The OIG subpoena specified approximately 102 individuals and 7 specialty areas, including orthopedic surgery, breast surgery, neurosurgery, vascular surgery, cardiology, podiatry, and obstetrics/gynecology. (*Id.* at 20-22).

### C.     United States' Complaint

On August 7, 2019, the United States elected to intervene in part and declined to intervene in part. (Dkt. 86).[1] The United States' Complaint in

---

[1] The State of Indiana declined to intervene on December 23, 2019. (Dkt. 94).

Intervention, against only Defendant Community Health Network, Inc. ("CHN"), was filed on January 6, 2020. (Dkt. 96).

The United States contends that CHN knowingly submitted claims to Medicare that were false because they resulted from violations of the federal physician self-referral law, commonly known as the Stark Law. (*Id.* at 1). It alleges that CHN violated the Stark Law by (1) submitting claims to Medicare for designated health services referred by certain specialists to whom Community Health paid salaries that exceeded fair market value, (*id.* at 16-18), and (2) submitting claims to Medicare for designated health services referred by physicians to whom CHN paid service line financial performance ("SLFP") bonuses that took into account the volume or value of the physicians' referrals to CHN, (*id.* at 19).

### D.    Relator's Second Amended Complaint

On March 3, 2020, Relator filed for leave to file a second amended complaint. (Dkt. 108). The proposed second amended complaint included allegations regarding ambulatory surgical centers ("ASCs"). (*E.g.*, Dkt. 108-1 at ¶ 5 ("Community paid illegal remuneration to investor physicians by funneling money through equity interests in ambulatory surgical centers ('ASCs') and other joint ventures")). Relator's motion was granted on November 25, 2020, (Dkt. 133), and his Second Amended Complaint was subsequently filed on December 2, 2020, (Dkt. 134).

### E.    "Discovery on Discovery"

As noted in a prior order, discovery in this case has been slow-going. (Dkt. 528). The parties' many disagreements have significantly slowed its progress.

On December 20, 2022, the parties appeared before the Honorable Mark J. Dinsmore for a telephonic status conference. In advance of the conference, the United States and Relator alerted the Court to concerns regarding CHN's litigation hold practices. (Dkt. 474 at 14-19). At the conclusion of the conference, the Court authorized discovery into CHN's discovery practices, ordering that "any depositions conducted to explore a party's compliance with their discovery obligations do not count toward the number of depositions a party may conduct as established by Rule or Court order." (Dkt. 475 at 1).

The United States and Relator subsequently conducted written discovery as well as multiple depositions regarding CHN's compliance with its discovery obligations. (*See, e.g.*, Dk. 532-4; Dkt. 532-19; Dkt. 546-3; Dkt. 546-6; Dkt. 603-6). Part of that inquiry related to CHN's litigation hold efforts. (*See, e.g.*, Dkt. 532-19 at 8).

## F.   Discovery Dispute

On May 1, 2023, Relator filed the present Motion, asking the Court to compel production of the litigation hold notices and to authorize deposition testimony "regarding the litigation holds as well as CHN's preservation efforts." (Dkt. 532-1 at 27; *see also* Dkt. 559 at 19 (asking the Court to "direct CHN and its witnesses . . . to answer deposition questions about litigation holds, including their contents, dissemination, effects and related litigation hold processes and procedures")). CHN filed a response brief on May 15, 2023, and Relator filed a reply on May 23, 2023. (Dkts. 546, 559). The parties presented oral argument on May 30, 2023. (Dkt. 570).

## II.    Legal Standard

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or provides evasive or incomplete responses. Fed. R. Civ. P. 37(a)(2)-(3). The party opposing a motion to compel has the burden to show the discovery requests are improper and to explain *precisely* why its objections or responses are proper given the broad and liberal construction of the federal discovery rules. *Bell v. Pension Comm. of ATH Holding Co., LLC*, 330 F.R.D. 517, 520 (S.D. Ind. 2018); *Cunningham v. Smithkline Beecham*, 255 F.R.D 474, 478 (N.D. Ind. 2009). Once a response has been made, the burden shifts to the party seeking discovery to explain why the opposing party's responses are inadequate. *See Design Basics, Inc. v. Granite Ridge Builders, Inc.*, No. 1:06-cv-72, 2007 WL 1830809, at *2 (N.D. Ind. June 21, 2007) ("A motion to compel discovery or disclosure should both identify specifically the portions of the responses that are inadequate, and explain, at least briefly, what is missing or what kind of information would be necessary to make the responses adequate.") (citing James Wm. Moore, 7 Moore's *Federal Practice* § 37.05[5] (3d ed.)). Courts have broad discretion in resolving such disputes and do so by adopting a liberal interpretation of the discovery rules. *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F. Supp. 3d 1044, 1046 (N.D. Ill. 2018).

## III.    Discussion

Relator asks the Court (1) to compel CHN to produce "all litigation holds sent by CHN in this matter" and (2) to "allow Relator to elicit deposition testimony

5

regarding the litigation holds as well as CHN's preservation efforts." (Dkt. 532-1 at 27).

### A.     CHN's Litigation Hold Practices

Before addressing Relator's request, the Court first must provide some background regarding CHN's litigation hold practices. The following summary is compiled from the Court's review of the parties' briefs, exhibits, and oral argument.

CHN issued three different types of litigation holds in connection with this case. First, individuals received "verbal holds" from Karen Ann Lloyd, General Counsel for CHN. (Dkt. 532-5 at 2). Second, individuals received legal hold notices (alternatively referred to as litigation hold memos, hold notices, or written holds). These hold notices directed the recipients "to preserve all existing and future relevant data, including, but not limited to, hard copy documents, email data, personal server space, shared server space, computer hard drives, thumb drives, external hard drives, and other external media, and any data stores in work areas and offsite storage facilities." (Dkt. 532-1 at 25 (quoting Dkt. 532-6 at 3)). The third type of hold used by CHN in this case was the IT hold. An IT hold consisted of "a technological mechanism deployed in [CHN's] IT system to place certain electronic data on hold." (Dkt. 532-7 at 4). IT holds are not a written product, but rather a "setting" within the computer system. (*Id.*). Ms. Lloyd directed when IT holds would be put in place and to whose data they would apply. (Dkt. 532-5 at 32). IT holds could be placed on a user's mailbox, OneDrive, or both. (Dkt. 532-7 at 4).

As part of written discovery, CHN produced charts setting forth which individuals received holds, what type of hold(s) they received, and the dates of the holds. (Dkt. 532-19 at 34-58; Dkt. 546-6 at 34-58.)

Armed with this basic understanding of CHN's litigation hold practices, the Court now turns to the dispute at hand.

## B.    Privilege Over Litigation Holds

In making his case for compelled disclosure, Relator asserts that "CHN has not established that its litigation holds are privileged from disclosure." (Dkt. 532-1 at 10). More specifically, he argues that CHN's privilege invocation was "vague, blanket, [and] equivocating", (*id.* at 13), that "CHN's fault for the destruction of data . . . overcomes any applicable privilege invoked," (*id.* at 14), and that "CHN waived any privilege by intentionally disclosing the litigation holds' contents," (*id.* at 25). CHN rejects this position, maintaining that it never disclosed any privileged information and that its privilege(s) (attorney-client and work-product) over the hold notices remain intact. (Dkt. 546 at 12-16).

The Court finds that CHN has made an adequate, if barebones, showing that privilege extends to the content of its legal hold notices. CHN represents that the hold notices "were drafted by outside counsel and provided to [CHN's] General Counsel for input and dissemination after discussion with outside counsel." (*Id.* at 13). These confidential communications, CHN argues, "provide information and advice about document preservation obligations and about what information must

be preserved" and thus are properly shielded by the attorney-client and work-product privileges. (*Id.*).

Given the posture of this case, these assertions constitute sufficient grounds on which CHN can rest its privilege assertion. Although its earlier invocations may have been "vague" and "blanket," (Dkt. 532-1 at 13), the information that CHN has provided in its briefing of this motion is enough to carry the day. *See Tate & Lyle Ams., LLC v. Glatt Air Techniques, Inc.*, No. 13-2037, 2014 WL 10209161, at *2 (C.D. Ill. Aug. 4, 2014) (noting "some courts have compelled disclosure of a litigation hold letter once the moving party makes a preliminary showing of spoliation"); *City of Colton v. Am. Promotional Events, Inc.*, No. CV0906630PSGSSX, 2011 WL 13223880, at *2 (C.D. Cal. Nov. 22, 2011) ("As a general matter, litigation hold letters are not discoverable, particularly when a party has made an adequate showing that the letters include material protected under the attorney-client privilege or work product doctrine."); *Major Tours, Inc. v. Colorel*, No. 05-3091 (JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) ("As a general matter hold letters are not discoverable, particularly when a party has made an adequate showing that the letters include material protected under attorney-client privilege or the work-product doctrine."); *Muro v. Target Corp.*, 250 F.R.D. 350, 360 (N.D. Ill. 2007) (reviewing litigation hold notices which were "communications of legal advice from corporate counsel to corporate employees regarding document preservation" and finding they "on their face, appear[ed] to be privileged material"). The Court

will decline CHN's offer of an *in camera* review and find that the content of the hold notices is protected by the privilege.

The Court further finds that CHN's limited disclosure regarding the dissemination and scope of its holds does not constitute a waiver of its privilege.[2] As part of the ongoing discovery, CHN answered questions regarding the who, what, and when of its litigation holds. For example, CHN specified the type(s) of hold received by each custodian and the date each of the holds was issued. (Dkt. 532-19 at 34-58 (Relator custodians); Dkt. 546-6 at 34-58 (government custodians)). In response to inquiries by the United States, CHN also described the extent of data covered by the legal hold notices and IT holds. (Dkt. 532-6 at 3). CHN does not, and likely could not, invoke privilege over this information. (Dkt. 546 at 15-16). As CHN argues, however, this type of information is distinct from the *content* of the hold notices, over which privilege remains intact. *See Major Tours*, 2009 WL 2413631, at *2 ("Despite the fact that plaintiffs typically do not have the automatic right to obtain copies of a defendant's litigation hold letters, plaintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end.").

---

[2] The Court arrives at this conclusion, despite the fact that CHN neglected to issue a privilege log covering the litigation holds until *after* briefing and oral argument on this motion.

## C.      Preliminary Showing of Spoliation & the Applicable Test

Having found that CHN's invocation of privilege, however tenuous,

withstands Relator's challenges, the Court must now turn to the heart of this

dispute: alleged spoliation. Relator argues that he has made a preliminary showing

of spoliation and, as such, the Court should compel the production of CHN's hold

notices and related testimony. (Dkt. 532-1 at 14-26). CHN objects, stating that it

has taken reasonable steps to preserve relevant data and that Relator has not made

the requisite showing of spoliation. (Dkt. 546 at 17-28).

"Spoliation occurs when a party destroys evidence relevant to an issue in the

case." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). And, as relevant

here, upon a preliminary showing of spoliation, the Court may order production of

litigation holds. *See Tate & Lyle Ams.*, 2014 WL 10209161, at *2 (deciding "whether

the litigation hold letters should be disclosed because it is reasonable to infer that

Plaintiff destroyed relevant evidence, inadvertently or otherwise"); *Major Tours,*

2009 WL 2413631, at *5 & n.4 (finding moving party made preliminary showing of

spoliation and therefore ordering production of litigation hold letters, but explicitly

refraining from ruling whether spoliation sanctions should be imposed). As to this

point, both parties, mercifully, agree. (*See* Dkt. 532-1 at 14-15 ("a mere 'showing' of

spoliation can overcome any applicable privilege and result in production of

litigation holds"); Dkt. 546 at 17 ("A court may permit discovery of privileged legal

hold notices if the requesting party has made a sufficient 'preliminary showing of

spoliation.'")).

The parties disagree, however, about the burden incumbent on Relator when making this preliminary showing of spoliation. CHN urges the Court to apply the test applied in *Oleksy v. General Electric Company*. (Dkt. 546 at 17). There, in deciding whether to order production of litigation hold letters as a discovery *sanction*, the court considered three factors: (1) whether a breach of the duty to preserve or produce documents had occurred; "(2) the level of culpability for the breach; and, (3) the prejudice that result[ed] from the breach." *Oleksy*, No. 06 C 1245, 2011 WL 3471016, at *4 (N.D. Ill. Aug. 8, 2011) ((citing *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *31 (N.D. Ill. Oct. 23, 2000)). Relator, on the other hand, maintains that *Oleksy*'s test guides only an "ultimate *finding* of spoliation" and is "inapplicable" at this preliminary stage, (Dkt. 559 at 6, n.6 (emphasis in original))).

What test the Court will or will not apply is guided by the questions it needs to answer. Here, the Court is not making an ultimate finding of spoliation or issuing sanctions for any alleged spoliation.[3] Rather, its inquiry is limited to two questions: (1) whether a preliminary showing of spoliation has been made, and (2) if so, whether to compel production of the hold notices and associated testimony. Relator desires these two questions to be collapsed into one, but given the unique facts present here, the Court declines to do so for the reasons discussed below.

The *Oleksy* court applied the three-factor test when deciding whether to impose discovery sanctions. *Id.* at *4. Because sanctions were at play,

---

[3] If and when the Court does address such issues, its analysis will be informed by Federal Rule of Civil Procedure 37(e).

considerations of fault and prejudice were appropriate. *Id.* (discussing the role of "fault" in determining appropriate sanctions); *see also id.* at \*6 (applying the Seventh Circuit's standard of "impos[ing] discovery sanctions only in proportion to the offending conduct"). Outside of the sanction context, however, courts have made the requisite finding of a preliminary showing of spoliation and ordered discovery of litigation holds by focusing on only the first of the three *Oleksy* prongs – *i.e.*, whether data was lost after the duty to preserve began – and refraining from any extended discussion of fault. *See, e.g.*, *City of Colton*, 2011 WL 13223880, at \*4-5 (concluding the failure to issue timely litigation holds constituted a preliminary showing of spoliation); *Major Tours*, 2009 WL 2413631, at \*4-5 (expressly declining to rule on the issue of sanctions). This Court will follow suit and determine whether Relator has made a preliminary showing of spoliation by addressing the issue of whether relevant data was lost after the duty to preserve began.

## D.   Lost Data & Notice of Duty to Preserve

With this discussion out of the way, the Court now turns to the central question: has Relator made a *preliminary* showing that CHN destroyed relevant data after it was put on notice of its duty to preserve?

The duty to preserve is a fundamental tenet of the civil justice system. "A party's duty to preserve extends to evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action." *Northington v. H & M Int'l*, No. 08-CV-6297, 2011 WL 663055, at \*11 (N.D. Ill. Jan. 12, 2011) (citation and quotation marks omitted), *report and*

*recommendation adopted*, No. 08 C 6297, 2011 WL 662727 (N.D. Ill. Feb. 14, 2011).

A party's duty to preserve may be triggered before its formal receipt of a discovery

request or even before the filing of a complaint. *Northington*, 2011 WL 663055, at

*12.

In this case, the Court finds that relevant data[4] was destroyed. This case is

distinct, therefore, from cases where the moving party offers only speculation

regarding whether relevant information was destroyed. *E.g., Little Hocking Water

Ass'n v. E.I. Dupont De Nemours & Co.*, No. 2:09-CV-1081, 2013 WL 5311292, at *4

(S.D. Ohio Sept. 20, 2013) (finding that movant failed to make a preliminary

showing of spoliation because its "contention that information relevant to the issues

. . . ha[d] been destroyed [wa]s speculative at best"). As discussed herein, the lost

data consists of mailboxes and OneDrive data of a certain subset of the many

custodians involved in this case. Whether these custodians were involved in the acts

and decisions underlying the claims and defenses in this case does not appear to be

disputed. While the parties may agree on that front as well as on the fact that

certain data is gone, (Dkt. 546 at 9 ("O365 mailboxes for eight Government and

Relator Custodians and OneDrives for two Government and Relator Custodians

---

[4] The present analysis considers only email and OneDrive data. Billing data, although previously represented by CHN as "inaccessible," appears to have been preserved, although the accessibility of that data is still subject to debate. (Dkt. 532-11 at 2). The parties did not adequately develop arguments as to ESI beyond mailboxes and OneDrives, and therefore the Court will not address those categories here.

The Court also notes that over the course of briefing and oral argument, there was extensive discussion of CHN's transition from an old email system to Microsoft Office 365 in 2015. The Court has considered this system transition when relevant to the questions before it. Fortunately, it appears that the pre-2015 emails were all automatically archived (with or without a hold in place) and have now been (or will shortly be) produced. Those emails, therefore, are not addressed here.

were deleted"); Dkt. 620 at 2-3 (correcting prior filing to account for deletion of one additional OneDrive (for custodian Hany Haddad))), they vehemently disagree about whether CHN was on notice of its duty to preserve that data before its destruction, (*see, e.g.*, Dkt. 532-1 at 2-3; Dkt. 546 at 18-23). To determine whether Relator has made a preliminary showing as to this matter, the Court will now review each data set in turn, examining whether data was lost and when, if at all, CHN was on notice of its duty to preserve.[5] As noted by CHN, (Dkt. 546 at 17), this inquiry " is necessarily a fact-based" one. *Little Hocking Water Ass'n*, 2013 WL 5311292, at *4.

1. <u>James Read: O365 mailbox</u>

Mr. James Read, Jr., worked for CHN from March 2016 to February 2020. (Dkt. 532-19 at 31). From December 2018 to February 2020, Read served as the Vice President of Oncology. (Dkt. 546 at 21). Prior to that, he worked as the Senior Vice President of Product Line Strategy. (Dkt. 546 at 21, n.12). CHN's Manager of Provider Compensation, Ms. Nancy Butler (*id.* at 8), testified that Read had "a similar role as a director of finance in that . . . he was overseeing the provider comp[ensation] as well." (Dkt. 603-11 at 4). "[R]egardless of title, he was the main finance person for Community Physician Network." (*Id.*). It was during that period of his employment as SVP of Product Line Strategy, that Read received a hold

---

[5] The Court is not persuaded by Relator's suggestion (backed off, to some extent, during oral argument) that his inclusion of a custodian's name in his May 2, 2014, letter to CHN sparked CHN's duty to preserve. (Dkt. 542-1 at 2-12). While the content of his letter may have been sufficient to initiate the duty with respect to certain custodians, a party does not unilaterally determine the scope and timing of an opposing party's obligation to preserve by simply providing a list of names.

notice. (*Id.* (Dec. 21, 2017); *see also* Dkt. 546-6 at 52). An IT hold was never implemented for Read. (*Id.*).

Read left CHN on either February 14, 2020. (Dkt. 532-19 at 31). Thirteen days later, on February 27, 2020, Read's hold notice was lifted. (Dkt. 532-5 at 31). And five days after that, on March 3, 2020, Relator moved for leave to file his second amended complaint. (Dkt. 108). That proposed complaint included allegations regarding the oncology department, (*see, e.g.*, Dkt. 108-1 at 6), of which Read had been a part, (Dkt. 546 at 21).

No sooner than March 15, 2020 (30 days after his departure from CHN and 12 days after Relator moved for leave to file his second amended complaint), Read's O365 mailbox was deleted, pursuant to the Microsoft "retention policy." (Dkt. 532-13 at 2; Dkt. 546-2 at 2; Dkt. 603-6 at 39). Had an IT hold been in place when Read departed, the data would not have been lost. (*Id.*).

CHN asserts that it did not identify Read as a potential custodian until after Relator filed his Motion for Leave to File the Second Amended Complaint on March 3, 2020, which included allegations related to the oncology department. (Dkt. 546 a 21). This is a curious position to take, however, given that Read was issued a hold notice on December 21, 2017, a date that supposedly predates CHN's notice of the oncology allegations. In December 2017, Read was serving as the Senior Vice President of Product Line Strategy. And at that time, CHN most certainly was aware of the likelihood of litigation regarding physician compensation. (Dkt. 532-12 at 5; *see also* Dkt. 453 at ¶¶ 17-18 (After receiving the OIG subpoena requesting

documents relating to physician compensation, "[i]t was immediately apparent to [CHN] that there was a reasonable likelihood a false Claims Act lawsuit likely had been filed.")).

Given the record before the Court, physician compensation and "product line strategy," of which Read was Senior Vice President, appear to be connected. For example, in responding to the United States' Interrogatory No. 4 regarding physician compensation, CHN stated:

> Different specialties within the Network were referred to as specialties, specialty groups, groups, practices, practice groups, divisions, *product lines*, service lines, and other similar references. No one of these terms was used consistently or uniformly across the specialties. . . . [CHN] has chosen to use the consistent term "service lines" . . . to refer to all such groups, practices, practice groups, divisions, *product lines*, and services lines of Network-employed specialty physicians.

(Dkt. 500-1 at 5, n.3) (emphasis added)). And at another point in the same document, CHN stated: "Different individuals within Community have been involved in the incentive compensation metric development process from one year to the next. Generally, however, the service line GPDs [or Group Practice Directors] initiate the annual process by having discussion with physician service line leaders about which metrics to consider." (*Id.* at 8; *see also id.* at 9-10 ("Once developed, the GPDs for each service line present the proposed incentive compensation metrics to Network leadership for review and approval.")). It follows that in his role as the Senior Vice President for Product Line Strategy, Read likely had knowledge of, or involvement with, physician compensation. This conclusion is reinforced by Butler's testimony, (Dkt. 603-11 at 4 ("regardless of title, [Read] was the main finance

16

person for Community Physician Network.")), as well as the fact that CHN issued a hold notice to Read in December 2017.

Based on this record, the Court concludes that Relator has made a *preliminary* showing that CHN was on notice of its duty to preserve Read's data prior to the date of its deletion and that said data was relevant

### 2.   Jason Houston: O365 mailbox

Mr. Jason Houston worked for CHN from February 22, 2010, to December 27, 2019. (Dkt. 532-19 at 28). Houston was the Executive Director of Medical Staff Services. (Dkt. 559 at 15). Houston never received any type of hold.[6]

On or about February 3, 2023, (roughly a month after his departure from CHN), Houston's O365 mailbox was deleted, pursuant to the Microsoft retention policy. (Dkt. 603-6 at 40-41). Had an IT hold been in place when Houston departed, the data would not have been lost.

CHN asserts that it did not identify Houston as a potential custodian until it received notice of Relator's oncology allegations on March 3, 2020, (Dkt. 546 at 21), which post-dated Houston's departure. Relator's response does not develop an argument specific to Houston beyond mention of his title. (Dkt. 559 at 15).

Based on this record, the Court cannot conclude that Relator has made a preliminary showing that CHN was on notice of its duty to preserve Houston's data before its deletion.

---

[6] Although CHN previously represented that Houston received a verbal hold notice on February 2, 2022, (Dkt. 546-6 at 43), counsel for CHN corrected this apparent error at oral argument and informed counsel for Relator that Houston never received any type of hold.

3. <u>Susan Sandberg: O365 mailbox</u>

Ms. Susan Sandberg worked for CHN from January 12, 1998, to January 16, 2016, as a Vice President (1998 to 2011), Executive Vice President (2011 to 2014), and Regional Chief Operating Officer or COO (2014 to 2016). (Dkt. 546 at 21). Sandberg never received any type of hold. (*See* Dkt. 532-19 at 52 (absence of entry); Dkt. 546-6 at 52 (absence of entry)).

Like Read and Houston, Sandberg's O365 mailbox was deleted approximately 30 days after her departure from CHN. (Dkt. 532-6 at 2; Dkt. 546 at 22). Had an IT hold been in place when Sandberg departed, the data would not have been lost.

CHN asserts that the earliest it could have identified Sandberg as a potential custodian was when the United States referenced her in a presentation in November 2017, which post-dated Sandberg's departure. Relator does not articulate a clear response to this argument but notes that "Sandberg also has knowledge about the breast care integration." (Dkt. 559 at 16, n.18).

CHN included Sandberg on its Preliminary Witness List, (Dkt. 208 at 3 (filed on May 10, 2021)) and indicated that she would testify regarding "[b]reast care surgeon integration," (Dkt. 603-10 at 15). Breast surgery was one of the specialties identified in the HHS-OIG subpoena in November 2014. (Dkt. 532-16 at 20). And, at least according to the United States' Complaint, "CHN referred to the successful employment of [breast surgery and other] physicians as 'integrations.'" (Dkt. 96 at ¶ 51; *see also id.* at ¶ 59 ("The 'Breast Care Integration,' as CHN referred to the recruitment and employment of these physicians, was a defensive measure aimed

principally at securing referrals from surgeons, who are already practicing in the area.")).

From the record before it, the undersigned is persuaded that Relator has a made a *preliminary* showing that CHN was on notice of its duty to preserve Sandberg's O365 mailbox prior to the date of its deletion and that said data was relevant.

4. <u>Marvin Lodde, Jill Thomas, & Carol Wills: O365 mailboxes & OneDrive</u>

Dr. Marvin Lodde, Ms. Jill Thomas, and Ms. Carol Wills all worked in connection with ASCs.

Dr. Marvin Lodde worked for CHN as the ASC Medical Director from August 9, 2012, to November 10, 2021. (Dkt. 546 at 10). Ms. Jill Thomas worked for CHN from August 1, 1994, to July 15, 2017, as the South ASC Executive Director. (*Id.* at 22). And Ms. Carol Wills worked for CHN from June 28, 1999, to June 4, 2018, as the Hamilton ASC Executive Director. (*Id.*). Lodde, Thomas, and Wills never received any type of hold. (*See* Dkt. 532-19 at 47, 55, 57 (absence of entries); Dkt. 546-6 at 47, 55, 57 (absence of entries)).

As a result, Lodde, Thomas, and Wills' O365 mailboxes and OneDrives[7] were deleted approximately 30 days after their respective departures from CHN. (Dkt. 546 at 22). Had IT hold(s) been in place, their data would not have been lost.

---

[7] Thomas and Wills appear to have left CHN before the company transitioned to OneDrives, thus only their mailboxes are at issue.

CHN asserts that Thomas and Wills were each "identified in 2022 as a potential custodian in connection with Relator's document requests related to his ASC allegations, which were served in April and September 2021." (*Id.*). Relator does not clearly respond to this argument. Neither party addresses Lodde.

The Court notes that the November 2014 OIG subpoena requested documents relating to the "acquisition or recruitment of and compensation paid to the [listed] entities, physicians and physician groups . . ., including but not limited to . . . offers of ownership or equity interests in ambulatory surgery centers . . . ." (Dkt. 532-16 at 18). Neither the South ASC (Thomas) nor the Hamilton ASC (Wills) was one of the listed ASCs, however. (*Id.* at 20-22). Both ASCs were identified in Relator's then-proposed second amended complaint filed on March 3, 2020. (*See, e.g.*, Dkt. 108-1 at ¶¶ 95, 105, 109).

Without more, the Court cannot conclude that Relator has made a preliminary showing that CHN was on notice of its duty to preserve Thomas or Wills' mailboxes before their deletion in 2017 and 2018.

Circumstances are different with regards to Lodde, however. Lodde's position as "ASC Medical Director," (Dkt. 546 at 10), suggests that CHN might have identified him as a relevant custodian upon (or shortly after) receipt of the OIG subpoena. In any event, Lodde did not leave CHN until *after* Relator gave notice of his ASC allegations (via his proposed second amended complaint) and *after* "Relator's document requests related to his ASC allegations, which were served in April and September 2021," (Dkt. 546 at 22). On this record, the Court finds that

Relator has made a *preliminary* showing that CHN was on notice of its duty to preserve Lodde's OneDrive and mailbox before their deletion in or around December 2021 and that said data was relevant.

     5. <u>Virginia Davidson: O365 mailbox</u>

   Ms. Virginia Davidson began working for CHN in September 2016 and remains in her position there as Executive Vice President and Chief Risk and Compliance Officer. (Dkt. 546 at 22). IT holds were placed on Davidson's mailbox and OneDrive on November 10, 2021, and September 8, 2022, respectively. (Dkt. 546-6 at 38). Davidson never received a hold notice or verbal hold. (Dkt. 546-6 at 38).

   Davidson's O365 mailbox, OneDrive, and I-Drive (the precursor to the OneDrive) were collected and preserved in CHN's discovery database. (Dkt. 532-19 at 15). As CHN acknowledged at oral argument, only Davidson's professional and ethical obligations prevented manual deletion of data before the IT holds were in place. (Dkt. 546-2 at 3). That said, the Court has no reason to believe that such obligations were ignored, and there is no evidence to suggest that such deletions occurred. Thus, the Court has no basis to conclude that there has been any data loss, much less one of any significance to this case. Therefore, the Court need not examine the question of when CHN was on notice of a duty to preserve Davidson's data.

6.   Dr. John McGoff, Dr. Kenneth Shaver, Russell Swan, & Hany Haddad: O365 mailboxes and OneDrive

Dr. John McGoff, Dr. Kenneth Shaver, Mr. Russell Swan, and Dr. Hany Haddad were all CHN Board Members.

Dr. John McGoff worked for CHN from September 28, 1987, to August 15, 2019, and served on its Board in 2008. (Dkt. 546 at 10; Dkt. 546-6 at 29). McGoff never received a verbal hold or a hold notice. (Dkt. 546-6 at 48). Nor was an IT hold placed on his data. (*Id.*). Therefore, McGoff's O365 mailbox was deleted approximately 30 days after his departure from CHN. (Dkt. 546-6 at 29). Had an IT hold been in place when he left, his mailbox would not have been lost.

Dr. Kenneth Shaver was a CHN Board Member from January 1, 2000, to April 13, 2020. (Dkt. 546 at 10; Dkt. 546-6 at 31). Shaver received a verbal hold on May 12, 2014, and a hold notice on November 5, 2015. (*Id.* at 53). No IT hold was placed on his data. Therefore, Shaver's O365 mailbox was deleted approximately 30 days after his departure from CHN. (*Id.* at 31). Had an IT hold been in place when he left, his mailbox would not have been lost.

Mr. Russell Swan served as a CHN Board Member from August 1, 2006, to January 1, 2021. (Dkt. 546 at 10; Dkt. 546-6 at 31). Swan received seven verbal holds (between May 12, 2014, and November 12, 2018) and three hold notices (on December 12, 2014, April 4, 2017, and February 2, 2023). (*Id.* at 55). IT holds were placed on his O365 mailbox on July 8, 2015, June 10, 2021, and January 24, 2023. (*Id.*). No IT hold was placed on his OneDrive. (*Id.*). Therefore, Swan's OneDrive was

deleted approximately 30 days after his departure from CHN. (*Id.* at 31). Had an IT hold been in place when he left, his OneDrive would not have been lost.

Dr. Hany Haddad was a physician and served as a CHN Board Member from May 1, 2009, to January 1, 2021. (Dkt. 620 at 3; Dkt. 546-6 at 28). Haddad received seven verbal holds (between May 12, 2014, and November 12, 2018) and a hold notice on June 4, 2014. (*Id.* at 41). IT holds were placed on his O365 mailbox on May 17, 2018, June 10, 2021, and January 24, 2023. (*Id.*). No IT hold was placed on his OneDrive. (*Id.*). Therefore, Haddad's OneDrive was deleted approximately 30 days after his departure from CHN. (*Id.* at 28). Had an IT hold been in place when he left, his OneDrive would not have been lost.

Other than a brief mention, CHN does not address the loss of these four custodians' data in its brief. (Dkt. 546). Relator mentions Swan in passing, saying he is "knowledgeable about physician integrations" and "appears on CHN's preliminary Witness List." (Dkt. 559 at 16 n.17).

Among other items, the November 2014 OIG subpoena requested documents relating to the "acquisition or recruitment of and compensation paid to the [listed] entities, physicians and physician groups . . ., including but not limited to . . . documents prepared for or by, presented to or by, or otherwise relating to the . . . Board of Directors." (Dkt. 532-16 at 18). The subpoena covered the time period of January 1, 2008, to November 18, 2014. (*Id.* at 6). McGoff, Shaver, Swan, and Haddad all served on CHN's Board during this time period. Based on this record, the Court finds that Relator has made a *preliminary* showing that CHN was on

notice of its duty to preserve these custodians' data upon, or shortly following, receipt of the OIG subpoena, a time which predates the data's destruction, and that said data was relevant.

CHN's inclusion of Swan on its Preliminary Witness List provides further reinforcement for this conclusion. (Dkt. 208 at 3). CHN indicated that Swan will testify regarding "[p]hysician integrations." (Dkt. 603-10 at 15). As noted above, physician integration (*i.e.*, compensation) is at the heart of this suit and was an apparent issue as soon as the OIG subpoena dropped. Moreover, Swan is specifically identified in the United States' Complaint, (*e.g.*, Dkt. 96 at ¶ 119), which was filed well before Swan's 2021 departure and the subsequent deletion of his OneDrive. The Court thus finds that Relator has made a *preliminary* showing that CHN was on notice of its duty to preserve Swan's OneDrive well in advance of its deletion.

In sum, considering the data loss associated with the above custodians both individually and collectively, the Court finds that Relator has made a preliminary showing that CHN destroyed at least some data after its duty to preserve said data had attached. When considering the significance of the roles played by the custodians (*e.g.*, Board Member, Senior Vice President) and the type of data that was lost (*i.e.*, emails and OneDrives), the Court further finds that it is highly likely that the lost data included information relevant to this case.

Therefore, for the reasons set forth above, Relator has made a *preliminary* showing of spoliation. The Court chooses not to end its inquiry there, however. Specifically, it declines to compel production of the hold notices and associated

testimony as an automatic result of this preliminary showing. Indeed, Relator requests far greater action from the Court than compelled production of the holds. Relator also seeks to depose CHN witnesses, including its General Counsel, regarding the rationale and process of its hold procedures. (Dkt. 532 at 25). This requested relief would approach the border of, and very likely invade, privileged territory. (*See supra* Part III.B). As such, taken as a whole, Relator's request borders on a request for sanctions as opposed to simple discovery. The Court will not authorize such moves lightly. Rather, the Court finds it appropriate to examine what will be gained by Relator should he be given the relief he requests.

### E.   Appropriate Relief

So, now the Court finally turns to the question of appropriate relief. As noted above, Relator asks for more than just compelled production of CHN's hold notices. (Dkt. 532). And in his reply, Relator clarifies that he is asking the Court to authorize deposition testimony regarding "litigation holds, including their contents, dissemination, effects and related litigation hold processes and procedures." (Dkt. 559 at 19).

Although the Court is convinced that Relator has made a preliminary showing of spoliation, it is not convinced that ordering production of the hold notices is appropriate here. No meaningful challenge has been made to the scope or effectiveness of the hold notices (or IT holds). Rather it is CHN's failure to issue any litigation hold whatsoever – written or otherwise – to certain custodians that (understandably) concerns the Relator (and the United States).

Against this backdrop, ordering CHN to produce the hold notices, for which it has made an adequate showing of privilege, will not sufficiently advance the ball. The litigation hold notices are not necessary to support any future spoliation motion. Just like the plaintiff in *Raynor v. Dist. of Columbia*, Relator "already knows when the litigation hold letter[s] would have issued, that the documents were not produced, and that the documents, to the extent they exist, should have been preserved. *Raynor v. Dist. of Columbia*, No. 14-750 (RC), 2020 WL 13603997, at *2 (D.D.C. May 6, 2020). That court concluded that "it [wa]s not clear why [the movant] need[ed] the litigation hold letter to pursue a spoliation claim." *Id.*

The same is true here. The Court determined that CHN destroyed some of its data after its duty to preserve arose, and CHN admitted that some of its data is gone. (Dkt. 546 at 9-10, 21-23; Dkt. 620). Relator argues that he needs the hold notices in order to determine what other information, in addition to that described above, has been lost, (Dkt. 559 at 19), but the extensive record in this case would appear to answer that question for him (or, at a minimum, come very close to doing so), (*see, e.g.*, Dkt. 532-19; Dkt. 546-6 at 16-58). Moreover, the real "unknowns" at this juncture relate to the verbal holds. Compelled production of hold notices will do nothing to illuminate this area.

Nor is it appropriate to order CHN to produce the hold notices as punishment. Punishing CHN is not a consideration at this stage, as the Court is not making an ultimate finding of spoliation or deciding the propriety of sanctions for any such spoliation at this time. *See Tate & Lyle Americas*, 2014 WL 10209161, at

*2 ("Ordering disclosure of a litigation hold letter differs from the imposition of a sanction for spoliation, *see Major Tours*, 2009 WL 2413631, at *5 n.4, which requires a showing that evidence was destroyed in bad faith."); *Danis*, 2000 WL 1694325, at *31 ("In general, sanctions are intended to serve one or more of the following purposes: (1) to ameliorate the prejudice caused to an innocent party by a discovery violation; (2) to punish the party who violates his or her obligations; and/or (3) to deter others from committing like violations."); *see also* Fed. R. Civ. P. 37(e) (setting forth potential sanctions should the Court conclude a party "acted with the intent to deprive another party of the information's use in the litigation").

Although Relator and the United States have raised legitimate concerns about the progress of discovery in this case and "discovery on discovery" has been authorized, forward momentum must nevertheless be maintained. One of the Court's primary goals is to direct the course of discovery "to secure the just, speedy, and inexpensive determination of" this proceeding. Fed. R. Civ. P. 1. The appropriate response to Relator's Motion is one that both keeps this principle at the forefront and addresses the critical discovery "unknowns" raised by Relator.

The Court concludes that Relator may elicit deposition testimony regarding the *scope* (but not content) of verbal holds as well as any litigation hold processes or procedures. Any such testimony shall be confined to factual inquiries (*e.g.*, who gave the verbal hold? how was the verbal hold documented? what data did the hold cover?) as opposed to inquiries likely to touch on CHN's legal strategy (*e.g.*, why was a hold issued to Custodian X on a particular date?).

## IV.   Conclusion

For the reasons stated herein, Relator's Motion to Compel Litigation Hold Notices Sent by CHN and Associated Testimony, Dkt. [532], is hereby **DENIED IN PART** in that: at this time, CHN is not compelled to produce copies of the hold notices issued in connection with this matter.

The remainder of the Motion is **GRANTED IN PART** and **DENIED IN PART.** Relator <u>may</u> elicit deposition testimony regarding the litigation holds (of all types) and CHN's preservation efforts. Relator may <u>not</u>, however, elicit testimony regarding: (1) the content of verbal holds or hold notices; (2) the rationale for placing holds on some custodians as opposed to others; or (3) the rationale behind when a particular hold was placed.

So ORDERED.

Date: 7/26/2023

M. Kendra Klump
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email