UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


```
UNITED STATES OF AMERICA,    )
STATE OF INDIANA, et.al.,    )
                             )
              Plaintiffs,)
                             )
vs.                          ) CAUSE NO: 1:14-cv-01215-RLY-MKK
                             ) Indianapolis, Indiana
                             ) February 16, 2024
COMMUNITY HEALTH NETWORK,    )
INC., et.al.,                )
                             )
              Defendants.)
                             )
--------------------------)
                             )
THOMAS P. FISCHER,           )
                             )
              Relator.   )
```


BEFORE THE HONORABLE M. KENDRA KLUMP, MAGISTRATE JUDGE


MOTION TO INTERVENE

* * * * *


COURT REPORTER:      jodie_franzen@insd.uscourts.gov

```
 1                       A P P E A R A N C E S

 2   FOR THE PLAINTIFF
     STATE OF INDIANA:
 3                          Mr. Lawrence J. Carcare, II
                            Mr. Matthew Garner Whitmire
 4                          INDIANA ATTORNEY GENERAL
                            8720 Castle Creek Parkway East Drive
 5                          Suite 250
                            Indianapolis, Indiana 46250
 6

 7   FOR THE DEFENDANTS
     COMMUNITY HEALTH
 8   NETWORK, INC., et.al:
                            Mr. Richard W. Westling
 9                          EPSTEIN BECKER & GREEN, P.C.
                            1227 25th Street, NW, Suite 700
10                          Washington, DC 20037

11                          Mr. Marc T. Quigley
                            KRIEG DeVAULT, LLP
12                          12800 North Meridian Street
                            Suite 300
13                          Carmel, Indiana 46032

14                          Mr. Thomas J. Costakis
                            KRIEG DeVAULT, LLP
15                          2800 One Indiana Square
                            Indianapolis, Indiana 46204
16

17   FOR THE RELATOR
     THOMAS P. FISHCHER:
18                          Ms. Kathleen Ann DeLaney
                            DELANEY & DELANEY LLC
19                          3646 North Washington Boulevard
                            Indianapolis, Indiana 46205
20
                            Ms. Virginia Grimm
21                          JOSEPH GREENWALD & LAAKE, P.A.
                            6404 Ivy Lane
22                          Suite 400
                            Greenbelt, Maryland 20770
23

24

25
```

1          (*In open court*)

2          THE COURT:  Today's date is February 16, 2024.  We

3     are here in Case No. 1:14-cv-1215.  My name is Magistrate Judge

4     Klump.  We have Ms. Franzen who is helping us today as the

5     court reporter.  And I would extend my appreciation to Judge

6     Sweeney and his staff for hosting us today.

7          We don't have anyone for the United States, although

8     someone may be on the line.  Attorneys on the line are just

9     listening only.

10          For the State of Indiana, we have Mr. Carcare and

11     Mr. Whitmire, correct?

12          MR. CARCARE:  Yes, Your Honor.

13          THE COURT:  All right.  Welcome, gentlemen.

14          For Relator, we have Ms. Delaney and Ms. Grimm.

15          MS. DELANEY:  Yes, good morning, Your Honor.

16          THE COURT:  And for Defendants, of course, we have

17     Mr. Westling, Mr. Quigley, and Mr. Costakis.

18          MR. WESTLING:  Good morning, Your Honor.  Thank you.

19          THE COURT:  Good morning.  Welcome to everyone.

20          So we're here today, of course, for a hearing on

21     Docket 728, which is Indiana's motion for leave to intervene.

22     Just going back very briefly, but everybody knows this as far

23     as the case timeline, Relator filed his original motion back in

24     July of 2014 to kick off this case.  Let's see, August of 2019,

25     the United States intervened in part and declined to intervene

1  in part.  December 5th of 2019, the State of Indiana declined

2  to intervene.  And then just this past month, at Docket 728,

3  Indiana filed its instant motion that is now under

4  consideration.

5       So I just want to follow up on a few things,

6  Mr. Carcare, that I think need development from your motion.  I

7  guess I'm going to start with the good cause standard.  Do you

8  have any additional argument regarding the definition of that

9  term?

10      MR. CARCARE:  No, Your Honor.  It basically, at a

11  very low threshold, it's the sort of threshold that the

12  Government needs every time that it gets an extension on a seal

13  -- in a sealed *qui tam* action.

14      THE COURT:  Do you believe that it's appropriate to

15  consider the gap between when the State declined to intervene

16  and the present motion or whether the State could have moved

17  more quickly?

18      MR. CARCARE:  No, Your Honor, I don't think it is

19  appropriate because, number one, the case is the Government's

20  case, the State's case.  It's the State's claims, it's the

21  rights that the State has protect -- is protecting, and a *qui*

22  *tam* action is different than a regular court action because --

23  well, *qui tam* stands for a long phrase in Latin that says he

24  brings the suit on behalf of the king and himself.

25      And here, in this case *qui tam*, we have two

1    sovereigns involved here, we have the United States and the

2    State of Indiana, and each one of us has independent rights

3    to -- in fact, we have a predominant interest in the case.   Not

4    only do we keep the lion's share of the funds, but we have

5    certain things that we can do, like we can move to dismiss the

6    case over the Relator's objection, we can settle the case, we

7    can limit discovery, and we can limit participation by the

8    Relator, but to do those, we have to become a party.

9         And the statute pretty much gives us free rein as

10   long as we have good cause.   And again, good cause is a very

11   low standard.   It's just some sufficient legal reason.

12        THE COURT:   So good cause appears, of course, in many

13   different contexts in the law.   For example, in Rule 16 we have

14   good cause to request a modification to the schedule.   There

15   the Court looks at, among other factors, the diligence of the

16   parties seeking the change.   Why would that sort of traditional

17   application of good cause not apply here?

18        MR. CARCARE:   Well, maybe it's more proper to look

19   closer to the good cause that's in the statute itself, and the

20   good cause there is, again, the standard that the Court uses

21   for extending the seal.

22        THE COURT:   Good cause is not defined by that

23   statute, no?

24        MR. CARCARE:   No, it is not.

25        THE COURT:   I guess what gives the Court reason to

1  step outside of the normal definition of good cause that

2  applies in other contexts?

3           MR. CARCARE:  Well, I think the reason that you step

4  out of that -- the context in other things is basically because

5  you look -- you put -- it's in the context of a *qui tam* case

6  and not the context of most other cases.

7           THE COURT:  All right.  Mr. Westling, or other

8  defense representatives, do you have a position as to the

9  primary factor to consider in this good cause analysis?

10           MR. WESTLING:  Well, Your Honor, relying on the

11  *Cutler* case that the Government cited in its brief, obviously

12  Judge Richardson sort of, I think, laid out what he thought the

13  test was and seemed to cite many authorities in that regard.

14  In particular, he did key on one of the points the Court has

15  raised, which is really the time between the decision not to

16  intervene and then the decision to intervene, which in this

17  case has been, if my calculations are right, almost five years,

18  and so, you know, I think that is an important consideration.

19  I think the other thing that Judge Richardson noted is that

20  it's also important to understand the why, so it's not just

21  sort of that you want to, but that -- you know, what is it that

22  causes the intervention to take place now, not necessarily why

23  it has suddenly come up in and of itself, but in particular

24  what has changed, what motivates that decision.

25           Obviously in our briefing we sort of noted there are

1    many cases that suggest there is some new evidence standard,

2    and while Judge Richardson probably, in a very lenient way,

3    didn't say that was determinative, some courts have found it to

4    be.   That was true of his colleague Judge Crenshaw in the

5    Middle District in the eye specialist case where he declined

6    the motion to intervene, but I do think that's the tension that

7    the Court has to sort of work through.   And what I really --

8    you know, when we filed our response, I think the Court

9    probably appreciated it's not an opposition per se, I think we

10   just couldn't really tell what the reasoning was and we're a

11   little surprised by, you know, the timing and here we are, we

12   have been at this, as you know, for quite a while and the State

13   has been a participant throughout in terms of every conference

14   we have with you, someone from the State has been present.   So

15   I think that's where we're struggling, but I think to me that

16   gap is very significant and really does play a role in the

17   Court's consideration of the good faith standard -- good cause

18   standard, excuse me.

19           THE COURT:   Thank you, Mr. Westling.

20           And, Relator, I'm not not calling on you, but given

21   that your -- well, just to clarify for today, Ms. Grimm or

22   Ms. Delaney, whoever is taking the lead, Relator is consenting

23   to the State's motion, correct?

24           MS. GRIMM:   Correct, Your Honor.

25           THE COURT:   All right.   So if you want to add to any

1    part of the discussion, throw up your hand, otherwise, I'm

2    probably not going to call on you with respect to some of these

3    standards that are applicable here.

4              MS. GRIMM:  Understood.  Thank you.

5              THE COURT:  So as Mr. Westling said, and was brought

6    up in the Defendants' response, you know, there is a lot not

7    said in the State of Indiana's reasons to intervene, so I want

8    to go through the four arguments or reasons that the State put

9    forth, and I will just follow the order, Mr. Carcare, that the

10   State used in its motion.  So first, the State asserted that it

11   has a predominant interest in prosecuting the Medicaid claims

12   brought by Relator that weren't resolved in the United States'

13   settlement.  United States didn't intervene with respect to

14   those Medicaid claims that the State is now seeking to

15   intervene on.  The State has certainly been aware of this since

16   2019, so I'm not sure it would have come as a surprise, or how

17   could it possibly have come as a surprise that the United

18   States' settlement did not resolve claims to which the United

19   States was not a party?

20             MR. CARCARE:  It wasn't a surprise, Your Honor.

21   The -- we have been aware of that fact, we have been a part --

22   we have been observing the proceedings as a real party in

23   interest, however, we have not been a party to the case due to

24   our declination.  However, we know that we -- we knew that when

25   we made the declination that we could later ask for leave to

1    intervene if we show good cause.  And again, good cause is a

2    very low standard, and so --

3              THE COURT:  But as to this first point, I guess, this

4    essentially just amounts to the generic State has a predominant

5    interest in these types of claims?

6              MR. CARCARE:  Well, it's -- it's a statutory grant of

7    this -- of the interest.

8              THE COURT:  Not diminishing the State's interest, but

9    it's frankly nothing specific to this case, this reason would

10   apply in every single *qui tam* case and would have applied in

11   August of 2019?

12             MR. CARCARE:  Yes.

13             THE COURT:  Okay.  All right.  So the second point is

14   the dearth of the case law, quote, unquote, on the question of

15   whether the Stark Law applies to State Medicaid claims.  And

16   again, this is sort of a -- well, I guess more case specific,

17   but this is an argument regarding Indiana's interest in this

18   question, this legal question, and you note that that extends

19   beyond just this case.

20             MR. CARCARE:  We have a particularized interest in

21   any outcome and the particularized interest is how does an

22   outcome in this case affect our ability to enforce our statute

23   in other cases and so that's where our -- it's another example

24   of the predominant interest is because not only will it affect

25   what happens in this case, but a negative ruling would affect

1    future enforcement.

2         THE COURT:  Couldn't the State achieve this interest

3    by filing a statement of interest, as it did back in March of

4    2020?  You said, quote:  The State has a significant interest

5    in the correct interpretation and application of the Indiana

6    FCA.

7         And that's why you said you filed the statement of

8    interest.  Why couldn't you just do that in the future?

9         MR. CARCARE:  An amicus brief or a statement of

10   interest doesn't carry the -- is not a sufficient way of taking

11   charge of the matter, and what we need to do with that

12   particular issue is we have to be a party so that we have

13   control over it.  And in a case that was abrogated on other

14   reasons, in *Everglades* the Eleventh Circuit said that it was

15   proper for the United States to intervene during the appeal of

16   *Everglades* because it was concerned about a negative ruling

17   from the Eleventh Circuit and that that would affect the United

18   States' ability to enforce the statute in similar cases in the

19   Eleventh Circuit, so the Eleventh Circuit found -- the Middle

20   District of Florida found and the Eleventh Circuit found that

21   that was sufficient good cause.

22        THE COURT:  That was, of course, after a negative --

23   in the view of the Government, the negative ruling had come

24   down.

25        MR. CARCARE:  Well, actually what -- no, there was

1    not a negative ruling.

2          THE COURT:  Oh, it was the risk of the negative

3    ruling from the appeal?

4          MR. CARCARE:  Actually what happened was that there

5    was a jury trial, the Relators appealed what they thought was a

6    meager jury award and then during that appeal is when the

7    United States wanted to intervene to settle with the -- to

8    settle with the Defendants.  They got less money than the

9    Relators were looking for, but they also protected the

10   interests that the Government had in being able to have

11   enforced its statutes in the Eleventh Circuit.

12         THE COURT:  All right.  So you mentioned, at least in

13   that case context, settlement.  The third reason that you are

14   proposing is that you are saying intervention will facilitate

15   settlement, and you say that approval and final settlement may

16   be reached in a timelier manner.

17         There is quite a history --

18         MR. CARCARE:  Yes, Your Honor.

19         THE COURT:  -- of settlement efforts in this case.

20   We have had three full-day settlement conferences with the

21   involvement of the Court.  I know that the parties have engaged

22   in, I'm sure, countless hours of settlement negotiations

23   between them, including the United States, obviously leading up

24   to this, and the parties remain actively engaged in settlement

25   efforts, and the Court is engaged in those settlement efforts

1    informally as well.

2          Without going into specifics -- we're on the record,

3    so you know, caution -- without going into specifics, how will

4    the State's intervention at this stage facilitate settlement?

5          MR. CARCARE:  Number one, the State has a different

6    viewpoint as to the objective of a settlement.  Our viewpoint

7    is that we want to have a fair, adequate, and reasonable, under

8    the circumstances, settlement, and we don't necessarily want to

9    maximize the extraction of money from the Defendant.

10          The other reason is that being part of these

11   discussions, instead of being presented with a settlement and

12   then saying yea or nay over it, it makes it happen a little bit

13   faster.

14          THE COURT:  Has the State been engaged in any

15   informal settlement negotiations with the defense or engaged in

16   any conversation with Relator?

17          MR. CARCARE:  Not as of this time.

18          THE COURT:  The most immediate impact then of

19   intervention, with respect to settlement, is it will move the

20   State to the primary negotiation chair and in some ways

21   sideline Relator, correct?

22          MR. CARCARE:  Correct.

23          THE COURT:  Has the State done its own investigation

24   of the case leading up to this date?

25          MR. CARCARE:  We have done some investigation, Your

1   Honor.

2         THE COURT:  To what extent has the -- obviously the

3   State has not engaged in discovery thus far.  The State asserts

4   it will not engage in independent discovery.  Have you reviewed

5   the discovery material that's been exchanged between the

6   parties?

7         MR. CARCARE:  I have not had a chance to look at

8   everything yet, Your Honor, I just started -- I just got the

9   case, well, the end of December.

10        THE COURT:  I just don't know how -- I'm just being

11   frank, how one can be in the primary negotiation seat in a case

12   of this magnitude without having reviewed the seemingly endless

13   trove of discovery material that's been passed back and forth

14   and argued about in this case.

15        MR. CARCARE:  Well, that's another reason why we

16   think we can be, say, more effective.  We're not entrenched in

17   any positions right now.  We don't have the battle scars from

18   this bickering back and forth on discovery.

19        THE COURT:  Okay.  I think we all have battle scars

20   in this case, but that's all right.  They're healed.

21        Maintaining your no opposition, Relator?

22        MS. DELANEY:  I'm checking in with co-counsel right

23   now.

24        THE COURT:  All right, just checking.

25        No one is talking about this explicitly, but

1   presumably it's a consideration that intervention by the State

2   changes the maximum possible recovery for Relator, correct?

3            MR. CARCARE:  Marginally.

4            THE COURT:  Well, okay.  5 percent?

5            MR. CARCARE:  5 percent, at most.

6            THE COURT:  All right.  You know, I'm going to pause

7   because Ms. Grimm just had to walk out, so I'm just going to

8   shift on to another topic and wait for Ms. Grimm to come back

9   in for this portion of the discussion, so pause on that.

10           Moving to your -- I've got to remember to pause by

11  putting it over there.  All right.  Don't let me forget to come

12  back to that, Mr. Westling.

13           All right, the fourth reason that the State puts

14  forth as supporting its motion for leave to intervene is that

15  the Defendants won't be unduly prejudiced by intervention, and

16  this I think has a lot of gray areas or unknowns, so the first

17  assertion by the State is that it doesn't intend to adopt

18  portions -- or intends, I'm sorry, to adopt portions of the

19  Relator's complaint with a few amendments.

20           Do you know what those amendments would be?

21           MR. CARCARE:  Right off the bat, I can name two of

22  them.  One of them I had discussed with defense counsel, and

23  that is during the pendency of this case, there was a technical

24  change in the Indiana laws.  The case was brought under Indiana

25  Code 5-11-5.5-1, et seq.  During the pendency of the case,

1   there was a second -- it was a second False Claims Act that was

2   enacted by the legislature, and that's Indiana Code 5-11-5.7-1,

3   et seq.  And basically the -- there is a -- the new statute has

4   a funnel that makes all of the Medicaid claims go over to the

5   5.7, and 5.5 becomes just a standalone general False Claims Act

6   for the State of Indiana.  And there is a part in 5.7 that says

7   that after I believe it's July 1st, 2014, any claims presented

8   after that are not covered by 5.5, so it's just a technical

9   amendment to show that the law changed a little bit.  And there

10  wasn't a substantive change, it was more procedural changes.

11  For example, 5.5 had a 180-day seal, initial seal, whereas 5.7

12  has a 1 --

13              THE COURT:  We blew that one.

14              MR. CARCARE:  Pardon me?

15              THE COURT:  We blew that.

16              MR. CARCARE:  Well, yeah.

17              THE COURT:  180 days, just by --

18              MR. CARCARE:  Like I said, it's a hypertechnical, and

19  the State being the State, we have to make sure that we're

20  making sure that the statute is properly used.

21              And then the other thing is in discussions with

22  Relator's counsel, they didn't use the same sort of linkage

23  between the Stark Law and the Federal Medicaid statute and

24  Indiana's Medicaid statute and we -- that amendment would --

25  that second amendment would put in that linkage.

1          Again, it's somewhat of a technical amendment.  It's

2  not a -- we're not adding new parties, we're not adding new

3  claims, it's just basically the laws under which those claims

4  are being brought.

5          THE COURT:  Would it adjust the elements of either

6  the claims or the affirmative defenses?

7          MR. CARCARE:  No.

8          THE COURT:  Mr. Westling, what do you think?

9          MR. WESTLING:  Well, Your Honor, I think the

10  difficulty here is that the statute that is currently pleaded

11  basically says that it only applies to -- or to make clear, it

12  does not apply to claims, requests, demands, statements, or

13  records submitted after June 30, 2014 in relation to the

14  Medicaid program, and so our view of the current complaint that

15  we have been defending is that there is no ability to recover

16  currently based on anything that happened after June 30th,

17  2014.  What I think the State is contemplating is an amendment

18  under the new statute, which I believe was passed right around

19  the time this complaint was filed, that would in essence make

20  those claims at issue for the subsequent ten years, and so it's

21  a substantial change here.

22          Now, I'm not in a position today, and I don't know if

23  this is the forum to argue about relation back, and all of

24  those other issues, but we do see that has a significant point

25  of prejudice in our analysis compared to where we find

1    ourselves today.  I will also note that when the State filed

2    its statement of interest back in 2020, you know, this was the

3    way the case was charged then and there was no comment at the

4    time about need to amend it in any way at a time when it would

5    have been before the litigation started, so just I think

6    factually that is significant in terms of seeing the

7    significance of any such amendment.

8          Similarly, I had not heard about the desire to use

9    the Medicaid-specific False Claims Act to sort of bootstrap the

10   Stark claims.  Obviously that is something we would have to

11   hash out if the State intervenes, but that is another

12   significant change because I don't think the complaint on its

13   face makes any Stark allegations related to the Medicaid claims

14   being filed in the name of the State.

15         THE COURT:  All right.

16         MS. DELANEY:  Your Honor, when it's convenient for

17   the Court, I have a response to your question.

18         THE COURT:  Yes, ma'am.  Go ahead, sure.

19         MS. DELANEY:  So I was a little surprised to hear the

20   State of Indiana say that they wanted to take the primary seat

21   on settlement because even if they were granted the right to

22   intervene, their intervention would be limited to the State

23   Medicaid claims.  They don't have any power to intervene or

24   take control over the declined Federal claims.

25         THE COURT:  So this was my question, so perhaps this

1    is showing my ignorance about the intricacies of all of the

2    different claims, but to date when we have been discussing --

3    "we," the parties and the Court -- have been discussing the

4    claims, often we talk about them in CHOP claims, ASC claims,

5    Johnson Memorial claims, we don't talk about them like Medicaid

6    and Medicare, so either Ms. Delaney or Ms. Grimm, if we have --

7    should the State's motion be granted and they are allowed to

8    intervene as to Medicaid, what is now like -- so we have the

9    United States' claims that they intervened in, before we just

10   had a second bucket that was all of the other non-intervene

11   claims, then we will have the State intervene Medicaid claims,

12   assuming that that motion was granted, so then what is a third

13   bucket, what is left over?  Because it's a lot, I think, right?

14            MS. DELANEY:  The claims that the State could

15   possibly intervene on are a very, very small portion of the

16   case.

17            THE COURT:  Does it fall into one of those, like,

18   CHOP, ASC, Johnson Memorial buckets, or is it just like a

19   sub-bucket of each of those?

20            MS. DELANEY:  I believe, but I'm not 100 percent

21   sure, that it's a sub-bucket of each of those, based upon who

22   paid for the services.

23            THE COURT:  That's what I was -- yeah.

24            Mr. Westling.

25            MR. WESTLING:  Yeah, Ms. Delaney is right.  So each

1   of those has an element depending on the theory of recovery, so

2   if we look -- it's probably easiest to do this by saying if you

3   take the integrations of the two sets of physicians, which we

4   still have, which are OB/GYN and ortho, we would argue the

5   State might take a different position that those are Stark only

6   claims, and so that is Medicare, not Medicaid.  With CHOP, that

7   is both Stark and kickback, so there is probably some overlap

8   there, and there would be some portion of that that was paid by

9   Medicaid.  The bulk of it would be Medicare.  And the same

10  thing would be true with the ASC's and Johnson Memorial, both

11  primary anti-kickback claims, but which involve Medicare and

12  Medicaid claims, with the Medicaid in each case being a fairly

13  small number comparatively just because of the way the payors

14  work.

15          THE COURT:  So just I'm making up a number, so like

16  say for CHOP, if you magically tomorrow resolved the -- the

17  State is allowed to intervene and you resolved the Medicaid

18  claims, it would take care of like 10 percent -- I'm just

19  making that up -- of CHOP?

20          MR. WESTLING:  I would think that's a fair number,

21  but I don't really have a sense of it.  I think -- this may be

22  a rare moment.  I think Relator and the Defendant would agree

23  that the bulk of the claims would still be left to be resolved.

24          THE COURT:  Ms. Franzen, bold that, Relator and

25  Defendants agree.

1               So we wouldn't be done, right?

2               MR. WESTLING:  That's correct.

3               THE COURT:  We're just going to continue on and

4 having essentially the same negotiations that you are having

5 right now, you would just take -- I mean I'm sure you would

6 argue about this, but like you would take whatever demand

7 Relator is making now and reduce it by 10 percent?

8               MR. WESTLING:  It would be something like that, yeah.

9               THE COURT:  I mean, yeah, you don't know what he is

10 going to do --

11               MR .WESTLING:  Obviously without getting into the

12 weeds of it all, it would be a small portion of the overall

13 ask, I suspect, from their side, and to the extent we're trying

14 to resolve it, we're trying to resolve all of it.

15               THE COURT:  Right.

16               So I guess, Mr. Carcare, back to you, how does that

17 facilitate settlement?

18               MR. CARCARE:  Well, we can't facilitate settlement of

19 claims that we don't own.  Okay?  We can facilitate the

20 settlement of the Medicaid claims, and what my understanding of

21 the discussion is that the undue prejudice that the Defendant

22 is alleging they may have is a small portion of the case, thus

23 lessening the potential impact of the undue prejudice.

24               THE COURT:  Other than I guess the fact it would have

25 to engage in essentially two negotiations.  It would have to

1    negotiate Medicaid and then continue on.

2              MR. CARCARE:  That's possible, yes.  However, it may

3    be -- it may be easier to get everything done all at once.

4              THE COURT:  But then you couldn't -- but that would

5    require Relator, then, to do musical chairs and switch back to

6    the first chair to finish the rest, right?

7              MR. CARCARE:  True.  But that's a situation that is

8    part of the fact that we have a case involving two sovereigns.

9    And that will happen anytime there is Medicaid involved is you

10   are going to have two sovereigns, there is going to be a state

11   involved and there is going to be the federal government

12   involved and there -- I have been a party to many settlement

13   negotiations in global Medicaid fraud cases where the United

14   States may have not exactly the same position that the states

15   do, and we -- we do get a partnership, sort of like a

16   tri-cornered settlement, that works.

17             THE COURT:  Okay.  All right.

18             MS. DELANEY:  Your Honor, if I may, on behalf of

19   Relator, one other follow-up point, I heard a comment earlier

20   about the State's settlement position and that they may not

21   want to extract the most dollars out of the Defendant and I

22   would just note that as the Relator, Mr. Fischer has the right

23   to review and object to any settlement if it's not fair and

24   reasonable under the statute and that wouldn't change whether

25   the State of Indiana intervened or not.

1              THE COURT:  He couldn't essentially veto the

2    settlement, but he would have an opportunity to have a hearing

3    in front of Judge Young.

4              MS. DELANEY:  Right.  So the only reason that the

5    Relator is consenting to this motion is because Indiana has a

6    right to prosecute and settle its own Medicaid claims, and as

7    the Relator, Mr. Fischer has the right to object if it's not a

8    fair and reasonable settlement, but we are only consenting to

9    their motion to the extent that they seek to take charge of

10   their own State Medicaid dollars claim.  It would have no

11   effect and could have no effect on the Relator's prosecution of

12   the declined Federal claims, which we are continuing to

13   prosecute in the name of the United States Government and

14   which, again, is the vast majority of the unsettled portion of

15   this enormous case.

16             THE COURT:  All right.  So another comment that you

17   make -- or that the State makes, Mr. Carcare, with respect to

18   Defendants not being unduly prejudiced is that -- and this is

19   for the whole -- I mean everybody, including Relator, I think,

20   is that you don't anticipate seeking amendments to the case

21   management plan, but then of course you have got the lawyer

22   caveat, "solely on the basis of its intervention."  So, I mean,

23   the liability discovery closes on June 3rd, I mean, so is there

24   another basis that you are going to seek to amend the case

25   management plan?

1          MR. CARCARE:  No, Your Honor.  No.  In fact, we
2    inserted the "solely on the basis" at the request of the
3    Relator because they had -- they were anticipating filing and
4    they have filed a joint motion for -- to enlarge the dates on
5    the case management plan.
6          THE COURT:  I think that is June -- is that one still
7    pending?
8          MR. WESTLING:  That's the one you ruled on, Your
9    Honor.
10          THE COURT:  Oh, yeah, I think that's June 4th.  Yeah,
11   yeah, that is June 3rd.  Yeah, that one has been ruled on.
12   That's what I thought.
13          All right.  So I mean, like, the *Polansky* case, for
14   example, that you cited, which seems -- I mean, I don't know,
15   they talk about a different issue, but one of the main points
16   in there is that when the Government intervenes like, you know,
17   has primary responsibility, it takes over the case, leader of
18   the charge, gets the first seat in the negotiation, but then if
19   I read your motion, it doesn't seem like you want to take
20   primary responsibility for the prosecution, you don't intend to
21   do discovery.  Like, what do you foresee as your role, or is it
22   simply a settlement role?
23          MR. CARCARE:  We feel it's going to be primarily a
24   settlement role, but we do not want to be limited to and say
25   that we're just intervening for the purposes of settlement only

1   because there really isn't a settlement on the table to talk

2   about.

3            THE COURT:  Okay.  I mean, there is no option to

4   intervene, like, if you are going to take over as Medicaid,

5   like, you are the Medicaid prosecutor, essentially, correct?

6            MR. CARCARE:  Right.  Right.  And --

7            THE COURT:  I mean, do you have -- are you going to

8   engage experts for this portion of the -- I mean in support of

9   your claims, then, if the motion was granted?

10           MR. CARCARE:  Well, we're not abandoning the work

11  that the Relator has done.

12           THE COURT:  So you are adopting just everything that

13  Relator is doing?

14           MR. CARCARE:  Right.

15           THE COURT:  So Relator is like the Shadow King or

16  something at the table?  I mean, not king, but like -- I guess

17  I'm not understanding.  So if you want to take -- if the State

18  needs to intervene to, like, vindicate the public interest or

19  act in the public interest but intends to do nothing other than

20  what Relator has done to this point, why is the intervention

21  necessary?  Why not just let Relator, who is the most

22  up-to-speed party on this side of the V, continue?  It seems

23  like they would be doing everything you would do.

24           MR. CARCARE:  The primary purpose is for we, we want

25  to have some control over what is going on, and we can't have

1    any control if we're not a party.

2         THE COURT:  Well, you could always -- I mean, don't

3    you have to approve whatever portion of the Medicaid settlement

4    happens with Relator, say they settle tomorrow?

5         MR. CARCARE:  We would rather be in the room making

6    -- baking the cake rather than having the cake come out and us

7    having to like it.

8         THE COURT:  Okay.  I like that analogy.  All right.

9         Say the motion is granted, Mr. Westling, would

10   Community serve discovery on the State?

11        MR. WESTLING:  I don't know that we have decided

12   that, Your Honor, but it would seem to me that the Medicaid

13   claims would become more significant than they have been to

14   date and we would have to consider that and I think the

15   question would be -- particularly the thing that's been said

16   here today sort of for the first time is if there is going to

17   be sort of a bootstrapping Stark theory, it would become, I

18   think, incumbent upon us to think about discovery from State

19   administrators at Medicaid about how they view that because

20   obviously materiality is always a question in these cases and

21   then the question becomes would Indiana deny claims if there

22   was a Federal Stark violation.  I don't know the answer to

23   that, that's not something I have looked at, but that's

24   something that occurs to me just sitting here today that might

25   well need to be developed if we were going to be defending,

1    with the State taking primary responsibility of those claims.

2          THE COURT:  And presumably that would put you out to

3    some extent if there is significant additional discovery that

4    you would have to engage in.

5          MR. WESTLING:  Well, there would be work to do, yes,

6    Your Honor.

7          THE COURT:  Just a little bit more work.

8          MR. WESTLING:  Just some more.

9          THE COURT:  Yeah, just more.  Not enough already.

10         Would it make a difference if this motion came like

11   one day before trial, which is, I don't know, TBD with Judge

12   Young?

13         MR. CARCARE:  I think it might, unless we had some

14   sort of magic pill that would make the parties all amenable to

15   settling on the courthouse steps.

16         THE COURT:  Where is that pill?

17         MR. CARCARE:  I wish I had those pills.

18         THE COURT:  I don't.  All right.

19         MR. CARCARE:  If I might, Your Honor.

20         THE COURT:  Go ahead.

21         MR. CARCARE:  The questions as to whether the

22   Defendant would have to conduct discovery of the State, well

23   the State has been -- the State's claims are there, they -- to

24   the extent that they haven't made discovery of them before,

25   that's not our fault.  And I have had cases, in fact a case

1  that was in this court, where the State was a non-party, but

2  there was non-party discovery, even though we were just only a

3  real party in interest, and there were depositions taken of

4  State experts in the area that we were looking at in that case.

5  So we would be subject to discovery in any event, and the

6  claims that are out there are claims for the State of Indiana,

7  but for Medicaid, and so, you know, those would have been part

8  and parcel of the discovery from day one.

9          THE COURT:  Fair.  I mean, but then if you choose to

10  intervene, it seems to increase the significance of those

11  claims.

12          MR. CARCARE:  The choice to intervene or not, it has

13  nothing to do with the validity of the claims that Relator

14  makes.  Sometimes it's because the Government has limited

15  resources or, in a case like this, maybe we wanted to keep our

16  powder dry until the Federal Government got its take, its

17  portion of the case finished.

18          MR. WESTLING:  Your Honor, if I may, just on that

19  point.

20          THE COURT:  Sure.

21          MR. WESTLING:  I think what is important and really,

22  I think, one of the reasons we were pleased the Court at least

23  wanted to talk through this is really the amendments are where

24  we probably have the greatest concern because while the State

25  can say we have had an ability to conduct our discovery, our

reading of the complaint today is that no Medicaid claim after
July 2014 is implicated and so what happens if the amendments
are permitted is that the conduct from '14 to 2020 whatever is
now in play in a way that we don't believe it is currently.  In
addition, the point I made about discovery earlier was really
more aimed to this point that Mr. Carcare made about the
attempt to use the Indiana statute to actuate the Stark Law in
a way that is not currently a theory in the complaint, so these
would be new issues that are arising based on the planned
amendment that would broaden the scope of potential need for
discovery, so I just wanted to clarify that.

THE COURT:  Would it implicate any -- you don't have
to commit, obviously, because this is all sort of theoretical
because we don't even know really what the amendments would be,
for sure, would it implicate or prompt any, like, Rule 12
motion by the defense, or would it just be any of those
arguments would be summary judgment or at trial?

MR. WESTLING:  I think I would imagine what would
happen is to the extent the State were to intervene, in my view
it would still need leave to amend or to file, I guess, a new
complaint, I'm not quite sure how this works, but if it does,
we would want to raise a question about its ability to bring in
future claims that are not currently charged in our view, and
we would want to at a minimum preserve our objection to that
and probably litigate that currently because obviously it

1    changes the complexion of what we're dealing with fairly

2    substantially, so I don't know that I have thought all of that

3    through, you know, sort of the block-and-tackle part of it, but

4    I do see it as an issue.

5            THE COURT:  So what is your response to that,

6    Mr. Carcare, that, you know, what may be presented as a

7    technical amendment, like, okay, we just change the statute

8    from this to this to get it up to speed, like that potentially

9    could change what claims are going forward or certainly defense

10   may have a different argument about what claims fall within the

11   scope of the case, that seems significant.

12           MR. CARCARE:  I understand that.  However, basically

13   what we're looking at is we're looking at allegations that

14   there are improper referrals based on the relationship of the

15   physicians to Community.  Now, these -- those facts exist

16   whether the patient that is in front of the doctor is a

17   Medicaid patient or a Medicare patient.

18           THE COURT:  Uh-huh.

19           MR. CARCARE:  And what the State of Indiana wants to

20   do is to give the Indiana Medicaid patients the same

21   protections that the Indiana Medicare patients were getting.

22   And that's a place that the State is uniquely qualified to take

23   care of, and that is an interest that the State has that is

24   unique to the state.

25           THE COURT:  Which was true in 2019?

1          MR. CARCARE:  Well, Your Honor, if today is too late

2     for the State to intervene, then it would be too late for the

3     United States to move to dismiss the other claims that were not

4     part of its settlement.

5          THE COURT:  Well, then they would have to move to

6     intervene in those claims, and they would have to show cause.

7          MR. CARCARE:  But if we're too late today, then

8     they're too late on those claims also.

9          THE COURT:  We're not talking about whether it's too

10    late for them.  I mean, then they would have to sit in your

11    chair and tell me why it was good cause.

12         MR. CARCARE:  Right, right.  And the effectiveness of

13    what we do is not the question here, it's whether we have shown

14    good cause to let us intervene.

15         THE COURT:  What do you mean "the effectiveness"?

16         MR. CARCARE:  For example, if we were making an

17    argument about the linkage between Indiana Medicaid, Stark, and

18    this case, then whether -- whether we can be successful with

19    that is not the question today.

20         THE COURT:  Understood, yeah, yeah, yeah.

21         MR. CARCARE:  The question is should we be able to

22    make arguments like that, and if we don't make the arguments,

23    then the Relator can make those arguments.  So they're going to

24    have to -- the defense is going to have to defend these claims

25    no matter what.

1        THE COURT:  Well, the Relator, though, would be --

2  would honor what you just said, I mean, the Relator is not

3  proposing to amend his complaint at this time, that would be

4  difficult for him to make that argument, right?

5        MR. CARCARE:  That might change the fact situation,

6  yes.

7        THE COURT:  All right.  So this isn't explicitly

8  stated anywhere in any of the briefs, but I would imagine it

9  may be a consideration -- or perhaps not, you can tell me --

10  the intervention -- should intervention be allowed, that would

11  decrease the potential maximum recovery for Relator as to those

12  claims, right?

13       MR. CARCARE:  There is a possibility that there would

14  be no change because in the case where the Relator is -- where

15  the Government has not intervened, the Relator can get a 25 to

16  30 percent, and if the Government -- if Indiana intervenes,

17  they can get between 15 and 25 percent.  And if they got

18  25 percent, they're in the same place.

19       THE COURT:  Well, okay, the brackets overlap.

20       MR. CARCARE:  The brackets do overlap, and it any --

21       THE COURT:  But 25 is less than 30.

22       MR. CARCARE:  Twenty-five is less than 30, but there

23  is nothing saying that they're going to get 30.

24       THE COURT:  Sure.  So 75, on the State's side,

25  75 percent recovery is more than 70 percent recovery.

1          MR. CARCARE:  Yes.

2          THE COURT:  We can all agree on that.

3          MR. CARCARE:  Yes.

4          THE COURT:  So is that a reason?  Does that establish

5   good cause or play into the good cause analysis that the State

6   will get potentially more money?

7          MR. CARCARE:  It doesn't make a difference to us.  We

8   want proper, we want proper attention paid to those claims, we

9   want to protect the rights of Indiana Medicaid patients, and we

10  want to have a fair, adequate, and reasonable settlement.

11         THE COURT:  So increasing potential recovery to the

12  public fisc is not a consideration?

13         MR. CARCARE:  Again, that's a hypothetical that I

14  really can't go into because we don't know whether there is

15  going to be -- we don't know what the Federal Government has

16  offered on the Relator's percentage on their claims.  We're not

17  -- because we're not a party to that.

18         THE COURT:  Right.  But we're talking about the

19  Medicaid stuff.

20         MR. CARCARE:  Right.  The Medicaid stuff, there --

21  you know, there is -- it's not -- motivation is not provided --

22  for the State is not provided by the potential 5 percent

23  difference.

24         THE COURT:  Okay.  So the motivation, like if you

25  boil it all down, the motivation is to be able to amend the

1    complaint to put Medicaid, Indiana Medicaid patients on the

2    same footing as Indiana Medicare patients for this issue about

3    post-2014?  I'm not up on like the July 1st and what effect

4    that has in the arguments, but that's, that's really -- when it

5    comes down to it --

6                MR. CARCARE:  Right.

7                THE COURT:  -- that's the case-specific interest of

8    the State in intervening at this stage?

9                MR. CARCARE:  Right.

10               THE COURT:  So I guess with that additional --

11   because we definitely learned additional -- I won't speak for

12   you, I learned additional information today about the details

13   of the State's argument for why it seeks to intervene.

14               I will just ask, Mr. Westling, did you learn

15   additional information about the reasons for the State's

16   reasons to intervene?

17               MR. WESTLING:  I think we developed a greater degree

18   of clarity about what certain terms and statements in the

19   motion meant.  I think that some of those things obviously

20   continue to give me pause, particularly when it comes to the

21   amendment issues.  I think that -- Your Honor, I note that,

22   again, the *Cutler* case sort of talks about when the

23   Government's primary motive is a general interest enforcing the

24   FCA sort of not being enough to show good cause.  I'm not sure

25   we have heard much more than that here.

1            With that said, I will also say that I think the

2     other avenue that is available to the State, as Mr. Carcare has

3     pointed out, to the extent settlement is the game, there is

4     always the ability to intervene for the purposes of settlement,

5     and that is sort of different from fundamentally getting in the

6     midst of the litigation that has been going on now for years

7     and so I think that's where our concern is.

8            Obviously the State clearly has rights to look after

9     its own interests and no one, I think, can take a position

10    contrary to that, but there are different ways to do that, and

11    what I don't think I have really heard today is sort of why now

12    because we have had these junctures in the case where decisions

13    have been made not to intervene, and I don't think much has

14    changed.  So, again, I appreciate the Court having the hearing

15    because I did learn a great deal more and I hope the Court has

16    as well and I think from my perspective, at least, I'm not sure

17    I yet see the good cause.

18            THE COURT:  Mr. Carcare, candidly nothing has changed

19    with respect to -- I mean, the law changed whenever it did.  So

20    as far as what you are saying is your interest to intervene is

21    the putting on equal footing Medicaid/Medicare patients for

22    post-2014, nothing has changed, right, since the beginning of

23    the case up until now?

24            MR. CARCARE:  Well, I think we are not recognizing

25    the elephant in the room, and that is the United States has

1   been able to get to a settlement with the Defendant.

2           THE COURT:  Right.

3           MR. CARCARE:  Okay.

4           THE COURT:   Okay.

5           MR. CARCARE:  And that is a major movement in the

6   case going forward.  And with that large obstacle out of the

7   way, Indiana now can work on its portion of the case.

8           THE COURT:  Why couldn't you file something in 2019

9   making all of the arguments you just did?  I mean, Mr. Westling

10  and his team have been adept thus far at responding to the

11  United States, responding to the Relator, I'm sure they could

12  respond to you as well.  I mean, I'm not sure why you need the

13  United States, quote, "out of the way" before you deal with

14  this issue.

15          *Polansky*, because you cited *Polansky* in your motion,

16  Mr. Carcare, and the reason I'm focusing on some of these

17  things, because *Polansky*, that case talked about the sealed

18  period not being an on-and-off switch.  This wasn't the

19  essential focus of the Court by any means, but in saying that

20  the sealed period is not an on-or-off switch for the Government

21  to intervene, the Supreme Court then proceeded to talk about

22  how circumstances can change and new information can come to

23  light.

24          And that's why I'm trying to figure out, like, did

25  any circumstances change other than the United States settling,

1    or new information come to light, so that's why I'm focusing on

2    what has happened between 2019 and now.

3              MR. CARCARE:  Again, I would say that prior to the

4    settlement, the State of Indiana might not have had the

5    resources to be a full participant in the case.

6              THE COURT:  And so now you have two attorneys on the

7    case now, correct, you and Mr. Whitmire?

8              MR. CARCARE:  Yes, we have two attorneys on the case.

9    But it's a smaller scope than it was 750 documents before.

10             THE COURT:  I know, the docket, if you print out the

11   docket, it's 116 pages.  I did, just in case something came up.

12   I had to reload the printer.

13             MR. CARCARE:  The docket is causing problems with our

14   case management program because it's too big.

15             THE COURT:  There's many aspects of this case that

16   are too big and causing problems with data management.

17             MR. CARCARE:  It's -- my game plan is to make sure

18   that we don't go past 800.

19             THE COURT:  Oh, man, that would be amazing.  All

20   right.  Not looking good.  Okay.

21             We're at 744 -- what are we at?  I should know.  Hold

22   on, I have got to check.  Because that is bold not going past

23   800.  We're at 759.

24             MR. CARCARE:  Pardon me?

25             THE COURT:  We're at 759, I think.

1          MR. CARCARE:  Okay.  I wouldn't have had that much

2   time to read all of that over this time.

3          THE COURT:  Okay.  All right.

4          Mr. Westling, not implying that Community needs to --

5          I saw you, Ms. Delaney.  I will get to you in one

6   second.

7          Not implying that you need to, but given that there

8   has been new information here, do you want an opportunity to

9   supplement the Defendants' response?

10          MR. WESTLING:  I think we do, Your Honor.

11          THE COURT:  Okay.  And like a week?  Two weeks?

12          MR. WESTLING:  Two would be great.

13          THE COURT:  We're going to be at 760, plus the minute

14   entry from today, 761.

15          MR. WESTLING:  Although I'm risking taking

16   Mr. Carcare's numbers down by filing something else, so I want

17   to be sensitive to that.

18          THE COURT:  I know, you can do like a shadow docket

19   entry where it doesn't get an entry.  We can talk to the

20   Clerk's office, just make some mammoth filing that attaches

21   like 20 motions, in violation of local rule.

22          MR. WESTLING:  You know I don't want to do that,

23   Judge.

24          THE COURT:  No one wants that.

25          Okay.  So two weeks for -- two weeks from today for

1    defense's supplemental response to Docket 728.

2              Ms. Delaney.

3              MS. DELANEY:  Yes, Your Honor.  Thank you.  I just

4    wanted to make clear on the record that we, the Relator,

5    consented to the motion to intervene on the basis of the

6    State's representation that the only amendment to the complaint

7    would be to a subsection of the State statute that we cited in

8    our second amended complaint, and we have not been told about

9    and have not seen and have not had a chance to review any

10   proposed amendment, so I'm not consenting on the Relator's

11   behalf to an amended complaint that I haven't seen yet, and I

12   just want to make clear for the record.

13             THE COURT:  Understood.

14             And, Mr. Westling, would this -- so say the motion

15   was granted, would then the State file a new complaint, or

16   would the State take over Relator's complaint and move to amend

17   that?

18             MR. WESTLING:  So I don't know the answer to that,

19   Your Honor.

20             THE COURT:  Shoot.

21             MR. WESTLING:  I think that what has been -- what I

22   have heard the State contemplate -- and I will ask Mr. Carcare,

23   he can address that, but would be to take over the claims, but

24   it sounds like there's amendments planned, and I don't think

25   that would be to Relator's complaint.  Most of the time when

1    the Government comes in they file their own complaint.

2             THE COURT:  Right.  Yeah.

3             MR. WESTLING:  That's what I would expect, but maybe

4    there is another way to do it.  I don't know.

5             THE COURT:  Mr. Carcare, what do you foresee as

6    happening if your motion was granted?

7             MR. CARCARE:  We would be filing our own complaint,

8    but the complaint would incorporate parts of the Relator's

9    complaint.  Of course we can't make any claims with regard to

10   federal statutes, the federal claims that are still

11   outstanding, and so it would be circumscribed so that we're

12   just looking at the Medicaid portion of the case.

13            THE COURT:  You would, in fact, have to file your own

14   complaint because, I mean, there is employment claims in there.

15   The State would have to have its own complaint.

16            MR. CARCARE:  Right.

17            MR. WESTLING:  Which would then, of course, set the

18   Rule 12 timeline and the answer and all of that.

19            THE COURT:  Right, which would delay everything.  And

20   then if Relator wanted to amend his complaint after that, well,

21   then that would be good cause all over again, but perhaps a

22   different version of good cause, depending on who you ask.

23            All right.  We're going to take --

24            Well, anything else for the State of Indiana?  I'm

25   going to take a brief recess basically just to check over my

1  notes and make sure there is not a question I forgot, and then

2  I will come right back out.  But before I do that, anything you

3  want to say right now, Mr. Carcare?

4          MR. CARCARE:  No, Your Honor.

5          THE COURT:  Mr. Whitmire?

6          MR. WHITMIRE:  No, Your Honor.

7          THE COURT:  Ms. Delaney?

8          MS. DELANEY:  No, thank you.

9          THE COURT:  Ms. Grimm?

10         MS. GRIMM:  No, Your Honor.

11         THE COURT:  Mr. Westling?

12         MR. WESTLING:  No, Your Honor.

13         THE COURT:  Mr. Costakis?

14         MR. COSTAKIS:  No, Your Honor.

15         THE COURT:  Mr. Quigley?

16         MR. QUIGLEY:  No, Your Honor.

17         THE COURT:  We will be right back.  We're going to

18 take a brief recess.

19         COURTROOM DEPUTY:  All rise.

20                 *(A recess was taken from 10:39 a.m. to*

21                 *10:44 a.m.)*

22         COURTROOM DEPUTY:  All rise.

23         THE COURT:  We are back on the record.  So I just

24 wanted to -- because an important aspect of this is delay, and

25 I think you would agree, Mr. Carcare, that resolution of the

```
 1   case, an efficient speedy resolution of the case is certainly

 2   in the public interest, right?

 3            MR. CARCARE:  Yes, Your Honor.

 4            THE COURT:  So, I mean, you are going to have to

 5   review discovery, I mean you can't get around that, right, if

 6   you are going to take over.

 7            So, ballpark, Mr. Westling, how much discovery has

 8   been produced in this case?

 9            MR. WESTLING:  We're somewhere at the 1.2 million

10   document level.  But, I mean, to be fair to everyone, Your

11   Honor, I don't know how much of that relates to which claim, so

12   that's just a gross number, but it obviously wouldn't be all of

13   that, but it's a lot.

14            THE COURT:  Right.  But we still would have to figure

15   out which relates to what.

16            All right.  Relator, does that sound about right, as

17   far as --

18            MS. DELANEY:  We're well over a million documents for

19   sure.

20            THE COURT:  And then as far as depositions so far,

21   Ms. Lloyd's discovery deposition was taken, right, only the

22   discovery one?

23            MR. WESTLING:  Right.

24            MS. DELANEY:  Only on spoliation.

25            THE COURT:  Right.  Mr. Matias' was taken, is that
```

```
 1   right --
 2             MR. WESTLING:  It was this week, Your Honor.
 3             THE COURT:  Okay.  Anybody --
 4             MS. DELANEY:  Mr. Pack was deposed and Jane Callahan
 5   was deposed and there may have been others.  Mr. Westling may
 6   remember.
 7             MR. WESTLING:  Jim Rohan of SullivanCotter.
 8             THE COURT:  Rohan is of SullivanCotter, or
 9   SullivanCotter was another one?
10             MR. WESTLING:  No, he was of SullivanCotter.  And
11   Renee Stolis who is also of SullivanCotter, I think.  And then
12   there was David Charles, and there is at least one other,
13   but --
14             THE COURT:  Okay.
15             MR. COSTAKIS:  I think there were two other
16   spoliation --
17             MS. DELANEY:  Right, other spoliation --
18             THE COURT:  Oh, right, of people with the documents,
19   with the boxes.
20             MR. COSTAKIS:  There were at least two others, Nancy
21   Butler and --
22             MR. WESTLING:  -- Rick Copple.
23             MR. COSTAKIS:  -- Rick Copple.
24             THE COURT:  Do you have any on the books right now?
25             MR. WESTLING:  We're working to schedule a couple.
```

1              MS. DELANEY:  Dr. Yeleti and Mr. Mills will be

2     deposed in the next several weeks.

3              MR. WESTLING:  Those are the ones where we are

4     waiting on final dates.

5              THE COURT:  And you don't have the deposition

6     transcripts for those, Mr. Carcare, or do you?

7              MR. CARCARE:  I would have to check.

8              THE COURT:  Okay.

9              MR. CARCARE:  However, I don't see any problem with

10    obtaining those transcripts.

11             THE COURT:  You are entitled to them.

12             MR. CARCARE:  Right.

13             THE COURT:  I was just checking if you had gotten

14    them.

15             MR. CARCARE:  And to lessen any misapprehension about

16    the case, it's not like we're going to throw away everything

17    Relator has done.  In fact, that would be foolhardy and we

18    fully intend to rely on the work that Relator has done and

19    Relator will probably give us guidance as to what things are

20    necessary for the Medicaid case and so it's not like we're

21    creating a case from scratch.

22             THE COURT:  Oh, understood, yeah.  I'm just trying to

23    figure out the benefit of switching horses, in a sense, or

24    switching the lead horse at this point, but it's only the lead

25    horse as to, like, a tenth of the flank.  I'm just trying to

1   figure it out.

2          Anything further, Mr. Carcare, before we conclude

3   today?

4          MR. CARCARE:  Not that I can think of, Your Honor.

5          THE COURT:  All right.  Thank you.  It was good to

6   meet you.

7          Ms. Delaney, Ms. Grimm, anything further for Relator?

8          MS. DELANEY:  No, thank you, Your Honor.

9          THE COURT:  Mr. Westling, anything further?

10         MR. WESTLING:  No, Your Honor.  Thank you.

11         THE COURT:  Thank you, everybody.  Oh, sorry, one

12   last thing.

13         Relator, you want to supplement your response?  Or

14   you didn't respond, but do you want to file a response, given

15   the additional information?  I will give you an opportunity to

16   do so in two weeks, if you want to.

17         MS. DELANEY:  Thank you.  We would like to consider

18   that, but I'm not ready to make a decision, but we will do it

19   within the two weeks if we decide to do it.

20         THE COURT:  Okay.  And just for, like, sake of

21   whatever, if you are going to not file anything --

22         MS. DELANEY:  We'll let you know.

23         THE COURT:  -- can you just put the ole no file on

24   the docket --

25         MS. DELANEY:  Sure, yes.

1          THE COURT:  -- even though it will eat up a number

2     and get us to 800.  All right.  Thank you.

3          Thanks, everybody.  We're adjourned.

4          COURTROOM DEPUTY:  All rise.

5               *(Adjourned at 10:49 a.m.)*

6          ***************************************

7          CERTIFICATE OF COURT REPORTER

8          I, Jodie Franzen, hereby certify that the foregoing

9     is a true and correct transcript from reported proceedings in

10    the above-entitled matter.

11

12    S/s Jodie Franzen

13    Signature of Approved Transcriber

14

15

16

17

18

19

20

21

22

23

24

25